**Robert Cecil MOODY, Petitioner–Appellant,**

v.

**Dan CORSENTINO, Sheriff of Pueblo County, Colorado, Respondent–Appellee.**

**No. 91SA277.**

Supreme Court of Colorado, En Banc.

Jan. 11, 1993.

Robert Cecil Moody, pro se.

G.F. Sandstrom, Dist. Atty., Scott B. Epstein, Chief Deputy Dist. Atty., Pueblo, for respondent-appellee.

Justice LOHR announced the Judgment of the Court and delivered an Opinion in which Justice QUINN and Justice KIRSHBAUM joined.

This case arises out of a writ of habeas corpus issued by the Pueblo County District Court. In response to a pro se petition filed by Robert Cecil Moody, the district court issued a writ directing Pueblo County Sheriff Dan Corsentino to show cause why Moody should not be released from the county jail. Pursuant to sections 13–45–101(2) and –103(1), 6A C.R.S. (1987), Moody was brought before the district court and hearings were conducted on his claim for wrongful detention. Thereafter,

the district court discharged the writ of habeas corpus. Moody now challenges that decision on appeal and raises numerous assignments of error.[1] Upon review of the record and consideration of Moody's arguments, we affirm the judgment of the district court.

I

In issuing its order discharging the writ, the district court made detailed findings of fact regarding Moody's involvement with the criminal justice systems of Colorado and Nebraska during the pendency of the criminal proceedings in Pueblo County that resulted in his confinement in the Pueblo County jail.[2] On April 12, 1983, the Pueblo County district attorney charged Moody with two counts of aggravated robbery and one count of criminal attempt to commit aggravated robbery. Moody posted a surety bond and was released from custody pending a January 8, 1985, trial. On January 7, 1985, pursuant to a plea agreement, he entered pleas of guilty to one count of robbery and one count of criminal attempt to commit robbery. The other charges that had been filed against him were dismissed. The court then ordered a pre-sentence investigation report and scheduled sentencing for March 4, 1985. Moody, however, failed to appear at the sentencing hearing, and the court consequently ordered the issuance of a warrant for his arrest.

After his release on bail prior to sentencing in the Pueblo proceedings, Moody went to Nebraska where he was later arrested for robbery under the name of Lenny Raymond Dixon.[3] Upon entering a no-contest plea to the Nebraska charges, he was sentenced to serve eight to twenty years in the Nebraska Penal and Correctional Complex.

While Moody was serving this sentence, the Nebraska authorities became aware that he had charges pending against him in Jefferson County, Colorado. Thereafter, on April 17, 1986, pursuant to the Interstate Agreement on Detainers (IAD), §§ 24–60–501 to –507, 10B C.R.S. (1988), the Nebraska correctional system relinquished temporary legal custody of Moody to Jefferson County authorities. After the Jefferson County District Court found him guilty of criminal charges and sentenced him to sixteen years with the Colorado Department of Corrections, he was transferred back to Nebraska's custody. Moody testified in the Pueblo County habeas corpus proceeding that in May of 1986, while he was in Jefferson County awaiting disposition of the charges against him in that county, he prepared a written motion to be produced in Pueblo County for sentencing on the charges to which he had pled guilty on January 7, 1985. The district court found that the Pueblo County district attorney's office never received this document, and the prosecuting attorney who had been in charge of the Pueblo action against Moody testified that, except as an attachment to Moody's petition for the writ, the document did not appear in the file of the Pueblo County District Court. After spending nearly a year in Colorado, Moody was returned to Nebraska with the Pueblo action still pending.

**1.** This court has initial jurisdiction over appeals of final judgments of district courts discharging writs of habeas corpus. *See* § 13–4–102(1)(e), 6A C.R.S. (1987) (excluding such appeals from those over which the Colorado Court of Appeals has initial jurisdiction).

**2.** We have been advised by the Pueblo County district attorney's office that on March 27, 1992, Moody was released from the Colorado Department of Corrections after having completed the term of incarceration to which he had been sentenced as a result of his convictions in Pueblo County. *See infra* note 5. His request for habeas corpus relief is not moot, however, as he must still satisfy a parole obligation before he

completely discharges his sentence. *Jones v. Cunningham*, 371 U.S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963) (since a person on parole is still subject to "conditions which significantly confine and restrain his freedom," habeas corpus review is available); *cf. Tippett v. Johnson*, 742 P.2d 314, 315 (Colo.1987) (appeal from denial of petition for habeas corpus relief moot when petitioner was released from both custody and parole).

**3.** We continue to refer to him as Robert Cecil Moody as that is the name under which he filed the habeas corpus petition.

In July of 1987, the Nebraska correctional authorities learned of Pueblo's warrant for Moody's arrest and filed the warrant as à detainer against him. Moody concedes that although he was notified of the detainer and was advised that he had a right to request speedy disposition of the sentencing action,[4] he made no such request. The following November, Moody was notified by the district attorney's office in Pueblo that the prosecution would seek his temporary custody as soon as possible for the purpose of sentencing. Through subsequent correspondence with that office, Moody asked that his return be postponed until he resolved some matters pending in Nebraska. The prosecution agreed to Moody's request and waited until February to initiate his return under the IAD. In April of 1988, however, Moody wrote another letter to the district attorney's office stating that he was not yet ready to return to Colorado because of pending legal proceedings in Nebraska but that he anticipated completion of the proceedings by the following June or July. The record reflects no response by the Pueblo County prosecutors to this letter and contains no other information of relevance covering the period preceding December of 1990.

At that time, Moody was released from Nebraska's correctional institution and was placed on parole. While serving his parole, Moody learned that on January 10, 1991, officials in El Paso County, Colorado, had filed a detainer with Nebraska authorities seeking his return to resolve charges pending in that county. Moody waived extradition and, at the joint request of El Paso and

Pueblo Counties, was transported to the El Paso County jail. On January 28, 1991, the El Paso County charges were dismissed and he was released from custody. As found by the Pueblo County District Court in the present habeas corpus proceeding:

> Subsequent to the dismissal of the charges pending in the El Paso County District Court Petitioner [Moody] should have been transferred to the Pueblo County Jail for further proceedings in Pueblo District Court Case number 83CR153 Division A. Petitioner, however, was informed by the El Paso County Sheriff's Department that there were no holds for him from Pueblo, Colorado and he was released from custody.

Thereafter, Moody traveled to Oakland, California, where his Nebraska parole was transferred. On February 10, 1991, Moody reported to his California parole officer, at which time he learned that Pueblo's warrant was still in effect. Moody was arrested on that warrant and, after waiving extradition, was returned to the Pueblo County jail. The Pueblo County District Court ordered the completion of a presentence investigation report and scheduled an April 1, 1991, sentencing for the crimes to which Moody had originally pled guilty in 1985.[5] Before the date on which he was to be sentenced, Moody filed his pro se petition for a writ of habeas corpus. The Pueblo County District Court ordered the issuance of such a writ directed to the Pueblo County Sheriff, Dan Corsentino, requiring him to show cause for Moody's restraint. After a hearing, the court discharged the writ. Moody appealed the judgment of dismissal to this court.

---

**4.** *But see* part V(B) of this opinion concerning the inapplicability of the speedy trial provisions of the IAD when a detainer is filed to hold a prisoner for sentencing on charges that have already been tried.

**5.** Although not contained in the record itself, a Pueblo County District Court minute order, which the Pueblo County district attorney's office provided to us by a September 28, 1992, letter, shows that on February 26, 1992, Moody was sentenced to five years of incarceration plus one year of parole on the robbery charge and to three years of incarceration plus one

year of parole for the crime of criminal attempt to commit robbery. On February 28, 1992, the district court granted Moody's motion for reduction of sentence under Crim.P. 35(b) and reduced the sentence on the robbery charge to four years and six months plus one year of parole. The court ordered that the sentences were to run consecutively and also determined that Moody had served over three years in presentence confinement. Consequently, Moody was paroled from the Colorado Department of Corrections on March 27, 1992.

## II

In his appeal, Moody presents the issues as follows:

I. Whether the prosecution's failure to return appellant to Pueblo, Colorado results in a dismissal of all charges?

II. Whether the Interstate Agreement on Detainers (I.A.D.) and the Uniform Mandatory Disposition of Detainers Act (U.M.D.D.A.) apply to the sentencing phase of the proceeding?

III. Whether the [Uniform Criminal Extradition Act, §§ 16–19–101 to –132, 8A C.R.S. (1986) ] applies to [the] sentencing phase of a criminal proceeding?

IV. Whether prosecutorial delay in obtaining appellant's presence for purposes of sentencing resulted in improper suspension or termination of proceedings and places appellant in jeopardy for second time on same criminal proceeding?

V. Whether district court judge erred in failing to recuse himself?

VI. Whether district court judge erred in merging habeas corpus (civil) and criminal proceedings.

VII. Whether district court judge's conduct improperly influenced and coerced appellant into withdrawing motion to recuse?

VIII. Whether erroneous advisements from district court, pertaining to habeas corpus proceedings amounted to plain error?

IX. Whether jails [sic] refusal to timely mail or deliver appellant's amended motion for new trial, prior to district court ruling, denied appellant access to court and prejudiced first habeas proceedings?

X. Whether inadequate law library facilities at the Pueblo County Jail interfered with and impeded appellant's ability to research and litigate habeas corpus proceedings?

## III

■ Before we address Moody's assertions of error, we summarize the nature and purpose of habeas corpus proceedings to provide a background against which to consider his arguments. A habeas corpus proceeding is a civil action, the usual purpose of which is to determine whether the person instituting the action is being unlawfully detained by the person who is holding him in custody.[6] *Cardiel v. Brittian,* 833 P.2d 748, 751 (Colo.1992); *Zaborski v. Colorado Dep't of Corrections,* 812 P.2d 236, 237 (Colo.1991); *Mulkey v. Sullivan,* 753 P.2d 1226, 1231–32 (Colo.1988). The procedures by which Colorado courts conduct the proceedings are statutory and are governed by sections 13–45–101 to – 119, 6A C.R.S. (1987 & 1992 Supp.) (Habeas Corpus Act). A person seeking the issuance of a writ of habeas corpus must make a written application "setting forth the facts concerning his imprisonment and in whose custody he is detained." § 13–45–101(1); *Cardiel,* 833 P.2d at 752. The court must issue the writ forthwith unless it appears from the petition and supporting documents that the petitioner is not enti-

---

**6.** Under some circumstances, habeas corpus relief may be available even though it does not result in a complete discharge from custody. *Kodama v. Johnson,* 786 P.2d 417, 419 (Colo. 1990). For instance, in *Naranjo v. Johnson,* 770 P.2d 784, 787 (Colo.1989), we determined that habeas corpus was available to test the constitutionality of statutes governing a prisoner's parole eligibility. Similarly, in *Marshall v. Kort,* 690 P.2d 219, 220, 222 (Colo.1984), we stated that "any restriction in excess of legal restraint that substantially infringes on basic rights may be remedied through habeas corpus, even if total discharge does not result" and therefore held that a petitioner who had been admitted to the state mental hospital after being found not guilty by reason of insanity could test the legality of his confinement by challenging the hospital's failure to provide treatment. *See also Schooley v. Wilson,* 150 Colo. 483, 374 P.2d 353 (1962) (habeas corpus is proper remedy for parolee to challenge legality of actual imprisonment resulting from allegedly defective parole revocation proceedings even though he would still be in constructive custody if returned to parole status).

In the present case, however, Moody contends that he is being unlawfully detained and seeks a discharge from the custody of the Colorado Department of Corrections.

tled to relief. § 13–45–101(1); *Cardiel,* 833 P.2d at 752. The petitioner bears the burden of alleging facts that warrant the relief sought. *Cardiel,* 833 P.2d at 752. If the court determines that the petitioner has set forth sufficient allegations, it must set a hearing upon the custodian's return of the writ. § 13–45–103(1); *Cardiel,* 833 P.2d at 752.

The only parties to a habeas corpus proceeding are the petitioner and the person holding the petitioner in custody. *Cardiel,* 833 P.2d at 751. The hearing procedure in a habeas corpus proceeding is less structured and more abbreviated than procedures employed in other civil proceedings. *Id.* at 752. This difference is based upon section 13–45–103(1), which provides that "[t]he court shall proceed in a summary way to settle the facts by hearing the testimony and arguments ... of the prisoner and the person who holds him in custody and shall dispose of the prisoner as the case may require." Where the petitioner asserts a right to freedom from custody, the only issue to be resolved is whether the custodian has authority to deprive the petitioner of liberty. *Id.; accord Reed v. People,* 745 P.2d 235, 238 (Colo.1987); *Stilley v. Tinsley,* 153 Colo. 66, 70, 385 P.2d 677, 680 (1963).

Against this background, we address the appropriateness of habeas corpus as a procedure for Moody's presentation of his assignments of error and then consider the merits of his contentions that the district court erred in denying him relief.

## IV

Initially, we must determine whether habeas corpus relief was a remedy available to Moody when he originally filed his petition with the district court. Pueblo County Sheriff Dan Corsentino (sheriff) urges us to dismiss this appeal on the basis that the district court's decision to discharge the writ could not have been in error because the court did not have authority to issue the writ in the first place. Specifically, the sheriff argues that Moody had not exhausted all of his legal remedies at the time he filed his petition because a motion to dismiss for lack of speedy prosecution was still pending in his criminal action.

█ Generally, a court will not consider a request for habeas corpus relief unless the petitioner has no other form of relief available. *Kodama v. Johnson,* 786 P.2d 417, 419 (Colo.1990) (availability of habeas corpus relief is dependent, in part, on unavailability of other remedies); *Garrett v. Knight,* 173 Colo. 419, 421, 480 P.2d 569, 570–71 (1971) (habeas corpus not available to petitioner who had an adequate remedy of trial de novo pursuant to an appeal and who failed to comply with the procedural requirements of the Habeas Corpus Act); *see also Mulkey,* 753 P.2d at 1232 ("Before a defendant can seek a writ of habeas corpus, he must first exhaust his legal remedies."). Consequently, the fact that at the time Moody instituted his action he still had other possible legal recourse, both through the trial court's resolution of his motion to dismiss and through a subsequent appeal if the court denied that motion, should have precluded issuance of the writ as premature. However, because the trial court has since resolved the motion against Moody[7] and because his time for filing an appeal challenging that ruling has expired,[8] we conclude that the fairest and most expeditious way to bring Moody's assertions of

---

**7.** The Pueblo County district attorney's letter, *supra* note 5, to which the trial court's order denying Moody's motion to dismiss was attached, shows that the matter was resolved on September 17, 1991.

**8.** The amended judgment of conviction was issued on February 28, 1992. *See supra* note 5. Pursuant to C.A.R. 3(a) and 4(b), a defendant who wishes to appeal a judgment of a trial court in a criminal case must file a notice of appeal with the appellate court within forty-five days after the judgment is entered. Because there is no indication that Moody has ever filed such notice, we assume for purposes of reviewing the discharge of the writ that he has waived his right to appeal the district court's judgment.

error to final resolution is to address them while they are presently before us. Accordingly, while recognizing that Moody's request for habeas corpus relief was premature, we will consider his substantive arguments that the district court erred in denying him relief. *See Blevins v. Tihonovich*, 728 P.2d 732, 733–34 (Colo.1986) (to expedite proceedings, court reviewed denial of habeas corpus relief even though petitioner inappropriately utilized habeas corpus rather than C.A.R. 21 to challenge trial court's refusal to permit petitioner to call a witness at preliminary hearing in criminal action).[9]

## V

### A

Moody first asserts that the prosecution's failure to return him to Pueblo and conduct a timely sentencing hearing violated his statutory and constitutional rights to speedy trial. We first consider his statutory claim.

Section 18–1–405(1), 8B C.R.S. (1986), requires that charges pending against a defendant be dismissed with prejudice if the defendant is not brought to trial on the issues raised in the charging document within six months of the date a plea of not guilty is entered. *See also* Crim.P. 48(b)(1). The defendant's right to dismissal is limited, however, in that:

> To be entitled to a dismissal under subsection (1) of this section, the defen-

dant must move for dismissal prior to the commencement of his trial and prior to any pretrial motions which are set for hearing immediately before the trial or prior to the entry of a plea of guilty to the charge or an included offense. Failure to so move is a waiver of the defendant's rights under this section.

§ 18–1–405(5).

Moody pled guilty to the pending Pueblo charges on January 7, 1985. Since he failed to move for dismissal of the charges prior to entering his plea, he waived his section 18–1–405(1) speedy trial right by the express terms of subsection (5) of that statute. *See People v. Drake*, 748 P.2d 1237, 1251–52 (Colo.1988) (defendant's failure to move for dismissal of charges prior to the beginning of trial results in a waiver of statutory right).

This, however, does not resolve Moody's contention that his constitutional right to speedy trial has been violated. Although the statutory right to speedy disposition of criminal charges derives from the federal and state constitutions, *see U.S. Const.* amend. VI; *Colo. Const.* art. II, § 16, and is "intended to render these constitutional guarantees more effective," *Simakis v. District Court*, 194 Colo. 436, 438, 577 P.2d 3, 4 (1978), compliance with the statutory requirements does not automatically satisfy constitutional demands. *Williams v. Lockhart*, 772 F.2d 475, 478 (8th Cir.1985) (compliance with state speedy trial law

---

9. There is also a question of whether Moody's arguments that his right to speedy trial was violated should have been asserted in a motion for post-conviction relief under Crim.P. 35(c), rather than under the Habeas Corpus Act. This court had historically held that constitutional claims of speedy trial violations are properly to be raised in petitions for habeas corpus relief. *Rader v. People*, 138 Colo. 397, 401, 334 P.2d 437, 439 (1959). However, in *Dodge v. People*, 178 Colo. 71, 73, 495 P.2d 213, 214 (1972), we determined that since prisoners were given the opportunity to seek post-conviction relief for denial of the constitutional right to speedy trial under Crim.P. 35, a motion under that rule was the proper avenue by which such claims should be pursued. We therefore treated the petition for a writ of habeas corpus in that case as a motion for post-conviction relief.

In Moody's case the sheriff does not challenge use of the Habeas Corpus Act on this basis. Thus, in light of our reluctance to dismiss habeas corpus actions merely because they would have been more properly filed as requests for post-conviction relief, *see, e.g., Kailey v. State Dep't of Corrections*, 807 P.2d 563, 567 (Colo. 1991); *Chatfield v. Colorado Court of Appeals*, 775 P.2d 1168, 1173–74 (Colo.1989), we address the merits of each of Moody's arguments. Furthermore, even though not all of Moody's assignments of error may be comprehended within Crim.P. 35(c), and therefore may not be properly presented by a post-conviction motion, we elect to treat them as timely asserted because they were raised in his habeas corpus petition before entry of his judgment of conviction.

"does not necessarily mean that the sixth amendment has been satisfied"); *Barela v. People*, 826 P.2d 1249, 1255 n. 5 (Colo.1992) (fact that defendant was accorded his statutory right to speedy trial did not necessarily establish that his constitutional speedy trial and due process rights were upheld).

■ Nor does the fact that Moody pled guilty and that the district court accepted the pleas preclude his constitutional challenges. Although the United States Supreme Court has not spoken definitively, it is generally accepted in the lower federal courts that a criminal defendant's right to speedy trial under the federal constitution extends through the sentencing phase of a prosecution. *See Burkett v. Cunningham*, 826 F.2d 1208, 1220 (3rd Cir.1987) (Sixth Amendment right to speedy trial "applies from the time an accused is arrested or criminally charged ... up through the sentencing phase of prosecution" (citations omitted)); *Perez v. Sullivan*, 793 F.2d 249, 252–53 (10th Cir.1986) (noting that since the Supreme Court's decision in *Pollard v. United States*, 352 U.S. 354, 361, 77 S.Ct. 481–485, 1 L.Ed.2d 393 (1957), in which the Court assumed that sentencing is part of the trial for the purpose of speedy trial protection, all other circuits that have addressed the issue "have either treated the subject as established law or have perpetuated the Court's assumption") (citing cases), *cert. denied*, 479 U.S. 936, 107 S.Ct. 413, 93 L.Ed.2d 364 (1986). Consequently, we consider Moody's constitutional challenge.

■ The constitutional right to speedy trial derives from both the Sixth Amendment to the United States Constitution and Article II, Section 16, of the Colorado Constitution.[10] It attaches at the time a defendant is formally accused by a charging document, such as a criminal complaint, information, or indictment. *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971);[11] *People v. Bost*, 770 P.2d 1209, 1216 (Colo.1989). Incarceration under a prior conviction, either in this state or another, does not abrogate or impair one's right to a speedy trial. *Smith v. Hooey*, 393 U.S. 374, 378, 383, 89 S.Ct. 575, 577, 579, 21 L.Ed.2d 607 (1969) (incarcerated prisoner entitled to speedy trial because delay in bringing him to trial may result in as much oppression as if he were held without bail on an untried charge); *Bost*, 770 P.2d at 1216; *Rader v. People*, 138 Colo. 397, 401–02, 334 P.2d 437, 439–40 (1959). A defendant who contends that this right has been infringed bears the burden of proving the alleged violation. *Bost*, 770 P.2d at 1216; *People v. Chavez*, 779 P.2d 375, 376 (Colo.1989). To assess such a contention, we must apply an *ad hoc* balancing test employing the following four factors: the length of the delay, the reasons for the delay, the defendant's assertion of the right, and the prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972); *Bost*, 770 P.2d at 1216; *Chavez*, 779 P.2d at 376. Although these factors must be considered in combination in order to determine whether a right to speedy

**10.** Although we refer to the constitutional "right" to speedy trial in the singular, the federal and state constitutions provide separate and independent sources for this right.

**11.** In *Marion*, the United States Supreme Court determined that in a situation where a defendant is arrested and continuously held in custody prior to filing of formal charges, constitutional speedy trial protections will date from the time of arrest. *Marion*, 404 U.S. at 320, 321, 321 n. 12, 92 S.Ct. at 463–464, 463 n. 12; *accord Dodge*, 178 Colo. at 75–76, 495 P.2d at 215 (relying on the analysis set forth in *Marion* to hold that a defendant's right to speedy trial attached

on the date that a detainer was lodged against him while he was incarcerated in state penitentiary because he was under arrest and was restrained from that date even though an information had not yet been filed against him).

In *United States v. MacDonald*, 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982), however, the Supreme Court made clear that the Sixth Amendment speedy trial right does not arise until an arrest or a filing of an indictment and that any delay prior to this time must be assessed under the Fifth Amendment Due Process Clause rather than under the Speedy Trial Clause contained in the Sixth Amendment. *Id.* at 7, 102 S.Ct. at 1501.

trial has been violated, the length of delay must be at least presumptively prejudicial to the defendant before further inquiry into the other factors is warranted. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192; *Bost*, 770 P.2d at 1216.

Accordingly, we begin our analysis by examining the delay between Pueblo's initiation of charges against Moody and its final resolution of those charges. Moody was first charged with the Pueblo County crimes on April 12, 1983. Upon his entry of guilty pleas immediately before his scheduled January 8, 1985, trial, the court promptly set a sentencing hearing for March 4, 1985.[12] Since Moody was not present on this date and was not returned to Pueblo until February 19, 1991, the hearing had to be rescheduled and did not occur until February 26, 1992. Thus, more than eight years had passed between the filing of the Pueblo County charges and final resolution of the case.

■ There is no established time period that automatically constitutes undue delay. *Barker*, 407 U.S. at 521, 92 S.Ct. at 2187 ("[w]e cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate"); *Wells v. Pet-*

sock, 941 F.2d 253, 257 (3rd Cir.1991) ("length of delay which is presumptively prejudicial and which triggers plenary inquiry into the circumstances surrounding the delay will vary with the particular features of each case"), *cert. denied sub nom. Wells v. Vaughn*, —— U.S. ——, 112 S.Ct. 3038, 120 L.Ed.2d 906 (1992); *Bost*, 770 P.2d at 1216–17. We are satisfied, however, that in the circumstances of the present case, eight years is sufficiently lengthy to warrant an inquiry into the other three factors. *Cf. Bost*, 770 P.2d at 1216–17 (twenty-nine month delay between arrest in another state and filing of a detainer sufficiently inordinate to trigger inquiry into other factors); *People v. Small*, 631 P.2d 148, 154 (Colo.1981) (forty-nine month delay between initial indictment and trial required analysis of other factors).

■ Therefore, we turn to the second factor and examine the reasons for the prosecution's delay in bringing Moody before the court for sentencing. It is well settled that delays attributable to a defendant are not to be considered in evaluating a contention of violation of speedy trial rights.[13] *E.g., Petsock*, 941 F.2d at 258 ("When the reason for the delay originates

12. Moody does not contend that his constitutional speedy trial rights were violated by the district court's setting of either his trial date or his initially-scheduled sentencing hearing. Rather, Moody's speedy trial argument focuses solely on the delay between March 6, 1985, the date on which he alleges that Pueblo prosecutors learned that he was being held in Nebraska, and his scheduled sentencing on April 1, 1991. Alternatively, Moody focuses on the time between May 1986, when he asserts that, while being held in Jefferson County, he submitted a written motion to be produced in Pueblo for sentencing, and the April 1, 1991, sentencing date as the period that we must consider in assessing his speedy trial arguments.

13. Although the fact that a defendant's own actions produce a period of delay may weigh against finding a speedy trial violation, the defendant's contribution to a delay does not render him unentitled to this Sixth Amendment protection. Therefore, even in circumstances similar to those presented in the present case where a defendant escapes from custody or otherwise precludes the prosecution from fulfilling its speedy trial obligation, courts will consider

the defendant's claim of speedy trial violation pursuant to the analysis set forth in *Barker*. *See, e.g., United States v. Bagster*, 915 F.2d 607, 611 (10th Cir.1990) (*Barker* analysis used even though initial delay in bringing defendant to trial resulted from defendant's own disappearance after he was improperly released by state authorities); *United States v. Brock*, 782 F.2d 1442, 1445–47 (7th Cir.1986) (*Barker* factors applied to determine whether post-indictment delay deprived defendant of his right to speedy trial even though much of delay was due to defendant's attempts to avoid arrest); *Hill v. Wainwright*, 617 F.2d 375, 377–78 (5th Cir.1980) (although the defendant was at large for nearly eight months after a warrant was issued for his arrest, court analyzed the defendant's constitutional claim of speedy trial violation by employing the *Barker* factors); *Brooks v. United States*, 423 F.2d 1149, 1151–53 (8th Cir.1970) (although defendant entered plea of guilty in federal district court but did not appear for sentencing when, while released on bond, he was arrested and incarcerated in state jail, court analyzed whether his Sixth Amendment speedy trial right was violated by considering the interval of delay, the reason for the delay, whether the defen-

with the defendant or his counsel, such delay will not be considered for purposes of determining whether the defendant's right to a speedy trial has been infringed."). Furthermore, delay caused by negligence or oversight on the prosecution's part does not weigh as heavily in favor of finding a speedy trial violation as does delay occasioned by a "deliberate effort to undermine the defendant's speedy trial rights." *Bost,* 770 P.2d at 1217; *accord Barker,* 407 U.S. at 531, 92 S.Ct. at 2192; *see also, Petsock,* 941 F.2d at 258 (absence of evidence of an "improper motive" on the government's part or of a " 'deliberate attempt to delay the trial in order to hamper the defense' " is relevant in evaluating asserted speedy trial violation) (quoting *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192).

▆▆ In *People v. Moye,* 635 P.2d 194 (Colo.1981), we considered a defendant's contention that his statutory speedy trial right had been violated in a factual situation having some important similarities to the one now before us. Specifically, we addressed whether the government's failure to bring the defendant to trial within the six-month time period required by section 18–1–405 was attributable to the defendant so that the charges against him were not required to be dismissed. We concluded that because the defendant failed to appear at a scheduled indigency hearing at which his attendance was required under a bond, and because he failed to inform either the district attorney or the trial court of his whereabouts after having been incarcerated in a different county pursuant to an extradition warrant, the resulting trial delays were attributable to his conduct and therefore were to be excluded

from the statute's speedy trial period. *Id.* at 196–97.

We find the analysis in *Moye* persuasive in evaluating Moody's assertion that his constitutional speedy trial right has been violated and conclude that the reasons for the delay in sentencing Moody were not so improper or unjustified as to lend significant support for his contention. Subsequent to the entry of Moody's guilty pleas, the district court scheduled a timely sentencing hearing for March of 1985. Moody did not appear. Rather, he left Colorado and traveled to Nebraska where he was arrested and incarcerated under the name Lenny Raymond Dixon. As was the case in *Moye,* the record contains no evidence that Moody attempted to communicate with his attorney or Pueblo County authorities to explain his inability to attend his sentencing hearing. Rather, the use of a different name in Nebraska suggests that Moody hoped to keep Nebraska authorities unaware of his criminal proceedings in Colorado. Since delays "caused by [a] defendant's avoidance of the criminal justice system can only be attributed to the defendant," *Moye,* 635 P.2d at 196, we must exclude from our calculation the period during which the Pueblo prosecutor's office was unaware of Moody's confinement in Nebraska. Moody does not contend otherwise. *See supra* note 12. The record is not clear exactly when Pueblo authorities learned that Moody was incarcerated in Nebraska, and the district court made no factual determination of this issue. The district court did find, however, that the Nebraska correctional department was informed of Pueblo's warrant for Moody's arrest on July 16, 1987, and that after the warrant was filed as a detainer on July 29, 1987, Pueblo authorities began correspond-

---

dant waived the right, and whether he suffered prejudice by the delay), *cert. denied,* 400 U.S. 872, 91 S.Ct. 109, 27 L.Ed.2d 111 (1970); *Hudson v. Sowders,* 510 F.Supp. 124, 128 (W.D.Ky. 1981) (*Barker* analysis applicable even though the defendant twice escaped from custody and was solely responsible for delay between indictment and trial), *aff'd,* 698 F.2d 1220 (6th Cir.

1982); *Steiner v. Commissioner of Correction,* 490 F.Supp. 204, 209–10 (S.D.N.Y.1980) (although majority of delay in bringing defendant to trial was due, in part, to defendant's failure to appear for scheduled hearing with the result that his bail was forfeited and a bench warrant was issued, court still engaged in Sixth Amendment speedy trial analysis).

ing with Moody regarding his return date.[14]

After learning of Moody's location, the prosecution notified him by letter dated November 3, 1987, that it would bring him back to Pueblo as soon as possible. Moody responded with a request that his return be delayed until he resolved some matters pending in Nebraska and indicated that he might be ready to return after February of 1988. In April of 1988, however, Moody made another request for postponement, this time suggesting that he would be available the following June or July. Although Moody contends that in both June and July he asked the Nebraska authorities to inform Pueblo authorities that he was ready to return, there is no evidence of any further communications between him and the Pueblo County district attorney's office.

The prosecution instituted action to obtain Moody's return in January of 1991, when it joined authorities in El Paso County, Colorado, in requesting his transfer back to Colorado. Upon waiving extradition, Moody was transported to the El Paso County jail. After proceedings in El Paso County which resulted in dismissal of the charges that had been pending against him in that jurisdiction, Moody was mistakenly informed that Pueblo County had no holds on him and was released from custody. Upon his rearrest in California and return to Pueblo the following month, the district court ordered completion of the presentence report and scheduled an April 1, 1991, sentencing hearing.[15]

Most of the delay in this case is attributable to Moody's own actions. Not only did he disable himself from attending the initially scheduled sentencing hearing by going to Nebraska and engaging in activities that resulted in his arrest and conviction, but he failed to notify Pueblo County authorities of his whereabouts and inability to attend the sentencing hearing. Moody further prevented Pueblo County authorities from locating him by using a different name while in Nebraska. It is also clear that he made at least two requests that his return to Pueblo be deferred. In addition, the absence of evidence showing that the prosecution intentionally caused delay as a means of undermining Moody's defense and the fact that a sentencing hearing was promptly scheduled upon his return to Pueblo lead us to conclude that the amount of unjustifiable delay that would support a conclusion of speedy trial violation was not extensive.

In addressing the third factor of our balancing analysis, we must determine whether Moody asserted his right to speedy trial. That is, did he diligently seek to be returned to Pueblo to resolve the outstanding sentencing action? *See Barker*, 407 U.S. at 528–29, 92 S.Ct. at 2191; *Bost*, 770 P.2d at 1217. Moody contends that he asserted his right in 1986 while in the temporary custody of Jefferson County authorities when he drafted a motion requesting to be produced for sentencing. This document never reached the prosecu-

---

**14.** Moody asserts that the Pueblo County district attorney's office knew of his location as early as March 6, 1985, and supports this by showing a request by the Pueblo County Sheriff to have Moody held in Nebraska for extradition. At trial, however, the prosecuting attorney who had been handling Moody's case testified that he did not learn that Moody was in Nebraska until sometime in 1987. In light of the absence of evidence indicating a deliberate attempt on the prosecution's part to hamper Moody's defense, we cannot conclude that the apparent lack of communication between the two offices caused the ensuing delay to be unreasonable.

Moody also asserts that the prosecution learned of his whereabouts in May of 1986 when, according to his testimony, he drafted a motion requesting to be produced for sentenc-

ing on the Pueblo charges during a time when Nebraska authorities had temporarily surrendered his custody to Jefferson County, Colorado, authorities so that charges pending against him in that latter jurisdiction could be disposed of. Since, as the district court found, the Pueblo County prosecutors never received this document, we reject May 1986 as the date on which the Pueblo County district attorney learned of Moody's location.

**15.** Moody was not actually sentenced until February 26, 1992, *see supra* note 5, because the court first needed to resolve the motion to dismiss the criminal action which the public defender had filed on Moody's behalf on August 19, 1991.

tion. Although late in 1987 he began writing letters to Pueblo authorities in which he indicated his desire to have the matter resolved, he requested delays at least until mid–1988 in order to complete other legal proceedings pending in Nebraska. The record does not indicate that Moody ever advised the Pueblo County district attorney's office whether those matters were completed. The record, therefore, reflects only limited efforts by Moody to seek a speedy sentencing. These efforts must be weighed with the other three factors, most particularly, with any prejudicial effect that resulted from the delay, in order to determine whether a speedy trial violation has been established. *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192.

Turning to this last factor, we conclude that Moody has failed to show that he suffered any prejudice as a result of the sentencing delay. The United States Supreme Court has identified three interests that the right to speedy trial protects: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532, 92 S.Ct. at 2192. Since Moody had already pled guilty to the Pueblo County charges and was merely awaiting final sentencing, he was not subjected to any undue pretrial incarceration. Rather, his incarceration was based upon a sentence imposed by the state of Nebraska. Furthermore, the fact that he was credited with more than three years of "pre-sentence confinement" for the time that he was in the custody of the Nebraska correctional authorities, with the result that he was released on parole one month after the Pueblo sentence was imposed, *see supra* note 5, greatly lessens the possibility that he was in any way prejudiced by the delay. Moreover, Moody makes no claim that he suffered anxiety, that the conditions of his

confinement in Nebraska were in any way affected, or that his ability to present mitigating evidence at his sentencing hearing was in any way impaired because of the delay in imposing sentence. We are persuaded therefore that the lack of prejudicial impact supports a conclusion that there was no violation of Moody's speedy trial rights.

In sum, although Moody has shown that there were significant delays in the final resolution of his criminal action and that he made some effort to be returned to Pueblo for sentencing, we are satisfied that when Moody's own contributions to the delay and his failure to show any prejudicial effect are factored into the analysis, the balance tips in favor of the conclusion that he was not denied his constitutional right to speedy trial. We therefore turn to his next assertion of error.[16]

B

■■■ Moody contends that his rights under the Uniform Mandatory Disposition of Detainers Act (UMDDA), §§ 16–14–101 to –108, 8A C.R.S. (1986 & 1992 Supp.), and the Interstate Agreement on Detainers (IAD), §§ 24–60–501 to –507, 10B C.R.S. (1988), were violated. Some background on the two acts may prove helpful in understanding the issues he raises. Both the IAD and UMDDA provide a means by which a prisoner incarcerated in one jurisdiction can seek the disposition of detainers that are filed against him in another jurisdiction. A detainer is " 'a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.' " *United States v. Mauro*, 436 U.S. 340, 359, 98 S.Ct. 1834, 1846, 56 L.Ed.2d 329 (1978) (quoting H.R.Rep. No. 1018, 91st Cong., 2d Sess. 2 (1970); S.Rep. No. 1356, 91st Cong., 2d

---

16. Based on the conclusion that neither Moody's statutory right nor his constitutional right to speedy trial were violated, there is no basis for the argument raised in his fourth issue that because the Pueblo County case should have

been dismissed on speedy trial grounds, he was twice placed in jeopardy for the same offenses when he was later sentenced in that case. *See U.S. Const.* amend. V; *Colo. Const.* art. II, sec. 18; § 18–1–301, 8B C.R.S. (1986).

Sess. 2 (1970)); *People v. Campbell*, 742 P.2d 302, 305 (Colo.1987); *People v. Morgan*, 712 P.2d 1004, 1006 (Colo.1986). The UMDDA applies to intrastate detainers, applicable when a prisoner in the custody of Colorado's department of corrections has other charges pending in this state, whereas the IAD governs the disposition of interstate detainers, filed by one contracting state that has charges pending against a person imprisoned in another contracting state. *Bost*, 770 P.2d at 1214; *Campbell*, 742 P.2d at 305–06; § 16–14–102(1); § 24–60–501. We have often stated, however, that these two acts embody like policies, and that generally, the principles of one may be applied to the other. *Bost*, 770 P.2d at 1214; *Campbell*, 742 P.2d at 306; *Sweaney v. District Court*, 713 P.2d 914, 918 (Colo.1986).

More specifically, the UMDDA provides that any person in the custody of the Colorado Department of Corrections may request a final disposition of "any untried indictment, information, or criminal complaint pending against him in [Colorado]" by writing the appropriate court and prosecuting official. § 16–14–102.[17] If the pending charges are not brought to trial within ninety days [18] of the receipt of the request, the case must be dismissed with prejudice. § 16–14–104. Thus, the UMDDA allows Colorado prisoners to "clear the slate" of outstanding Colorado cases. *People v. Mascarenas*, 666 P.2d 101, 105 (Colo. 1983).

In a parallel fashion, the IAD provides:

Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint; provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance....

§ 24–60–501, art. III(a). The IAD also provides for the dismissal of charges not tried within the required time after a request for final disposition:

[I]n the event that an action on the indictment, information, or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in article III ... the appropriate court of the jurisdiction where the indictment, information, or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect.

**17.** In full, section 16–14–102 provides:

(1) Any person who is in the custody of the department of corrections pursuant to section 16–11–301 or parts 1 and 2 of article 13 of this title may request final disposition of any untried indictment, information, or· criminal complaint pending against him in this state. The request shall be in writing addressed to the court in which the indictment, information, or criminal complaint is pending and to the prosecuting official charged with the duty of prosecuting it and shall set forth the place of confinement.

(2) It is the duty of the superintendent of the institution where the prisoner is confined to promptly inform each prisoner, in writing, of the source and nature of any untried indictment, information, or criminal complaint

against him of which the superintendent has knowledge, and of the prisoner's right to make a request for final disposition thereof.

(3) Failure of the superintendent of the institution where the prisoner is confined to inform a prisoner, as required by subsection (2) of this section, within one year after a detainer from this state has been filed with the institution where the prisoner is confined shall entitle the prisoner to a dismissal with prejudice of the indictment, information, or criminal complaint.

**18.** The prosecution may obtain additional time for good cause shown in open court. § 16–14–104.

§ 24–60–501, art. V(c); *Bost,* 770 P.2d at 1214; *Sweaney,* 713 P.2d at 917.

The district court found that neither the IAD nor the UMDDA provided grounds for Moody's requested relief. It concluded that neither act applied because "there was no 'untried indictment, information, or complaint' pending in [his] case."[19] Moody pled guilty to the Pueblo County charges and his conviction[20] was duly entered. However, he had not proceeded to the sentencing phase of his trial. We must therefore determine whether "any untried indictment, information, or complaint"[21] exists when a defendant has been convicted but not sentenced, so that he can seek relief under the provisions of the IAD and UMDDA.

Jurisdictions that have interpreted this language for purposes of applying the IAD have reached different results on this issue. Some hold that the IAD's requirements extend to a convicted prisoner's request for resolution of sentencing. *See Tinghitella v. State of Cal.,* 718 F.2d 308, 311 (9th Cir.1983) (since the Sixth Amendment's speedy trial protections extend to sentencing and since the IAD is to be liberally construed, sentencing detainers are within the act's coverage); *accord Hall v. State of Fla.,* 678 F.Supp. 858, 862 (M.D.Fla.1987). Others take the position that such a request is not cognizable under the IAD. *See State v. Barefield,* 110 Wash.2d 728, 756 P.2d 731, 733–34 (1988)

(IAD inapplicable when convicted prisoner seeks disposition of detainer filed for the purpose of obtaining his presence for sentencing); *accord People v. Mahan,* 111 Cal. App.3d 28, 168 Cal.Rptr. 428, 430–31 (1980); *People v. Castoe,* 86 Cal.App.3d 484, 150 Cal.Rptr. 237, 238–39 (1978); *People v. Barnes,* 93 Mich.App. 509, 287 N.W.2d 282, 283–84 (1979); *State v. Sparks,* 104 N.M. 62, 716 P.2d 253, 255–57 (App.1986), *cert. denied,* 103 N.M. 798, 715 P.2d 71 (1986); *People v. Randolph,* 85 Misc.2d 1022, 381 N.Y.S.2d 192, 194 (1976); *State v. Barnes,* 14 Ohio App.3d 351, 471 N.E.2d 514, 516 (1984). *Cf. United States v. Coffman,* 905 F.2d 330, 332–33 (10th Cir.1990) (determining that the term "trial" under article IV(e) of the IAD does not include sentencing and noting that "[t]he 'untried indictment, information, or complaint' language defines the reach and scope of the IAD").

In order to arrive at a proper statutory construction of the IAD and UMDDA, we first look to the express language of the acts, then consider the purposes for which they were established, and finally take guidance from the decision of the United States Supreme Court in *Carchman v. Nash,* 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985), interpreting the meaning of the phrase "any untried indictment, information, or complaint" as it applies to a probation-violation detainer under the IAD. Based upon these considerations, we are persuaded that the better view is that the IAD and UMDDA do not apply to a prison-

**19.** With regard to the UMDDA, the district court also concluded that Moody did not have any rights under that act because "at no time was [he] in the legal custody of the Colorado Department of Corrections." Moody contends that the UMDDA's "custody" element was satisfied when Jefferson County took him into temporary custody and subsequently found him guilty of criminal charges and sentenced him to serve sixteen years imprisonment on those charges. We need not resolve whether the district court correctly interpreted this requirement, however, because our conclusion that there was no "untried indictment, information, or criminal complaint" pending in his Pueblo County case precludes Moody from invoking the UMDDA as a basis for relief.

**20.** "Conviction" as used here refers to the determination of guilt, not to a judgment of convic-

tion which encompasses a recital of the plea, the sentence, a finding of the amount of presentence confinement, and the costs assessed against the defendant. *See* Crim.P. 32(c).

**21.** The UMDDA refers to "any untried indictment, information, or *criminal* complaint." § 16–14–102 (emphasis added). Since the complaint against Moody was a criminal complaint, we need not address whether the additional word in the UMDDA creates a substantive distinction between the IAD and UMDDA. Thus, we continue our analysis in accordance with the principle that the two acts embody like policies. Furthermore, for ease of reference, we continue to refer to the phrase as it is set out in the IAD.

er's request to be sentenced in an action where he has already been convicted.

 Well settled principles of statutory construction guide our analysis of the scope of the IAD and UMDDA. In construing statutes, a court's primary task is to ascertain and give effect to the intent of the legislature. *State Bd. of Medical Examiners v. Saddoris*, 825 P.2d 39, 42 (Colo. 1992); *Woodsmall v. Regional Transp. Dist.*, 800 P.2d 63, 67 (Colo.1990). To do so, the court must look first to the statutory language. *Woodsmall*, 800 P.2d at 67. When that language is clear and unambiguous there is no need to resort to interpretative rules of statutory construction, *id.; Bloomer v. Boulder County Bd. of Comm'rs*, 799 P.2d 942, 944 (Colo.1990), and the court must apply the words according to their commonly accepted and understood meaning. *Woodsmall*, 800 P.2d at 67.

The operative language of the IAD and UMDDA describes detainers based upon "any untried indictment, information, or complaint." We have previously determined that this language does not encompass a detainer that is filed against a prisoner who has been both convicted and sentenced but who has not completed the terms of his sentence. *Reed v. People*, 745 P.2d 235, 239–40 (Colo.1987). Specifically, in *Reed* we concluded that a detainer lodged against a Colorado inmate by another state in which the inmate had been convicted and sentenced but escaped prior to completion of his sentence was not a detainer under the IAD because the charges that the foreign state had instituted against the inmate had been disposed of. *Id.* We determined that the absence of pending charges meant that there was no "untried indictment, information or complaint" and that the inmate was therefore precluded from invoking the IAD's procedural protections. *Id.; see also Matter of Extradition of Beals*, 631 P.2d 1181, 1183 (Colo.App.1981) (because there was no "untried indictment, information, or complaint" outstanding, IAD did not apply to an in-

mate who was wanted in another state for escape after having been convicted and sentenced in that state); *People v. Jackson*, 626 P.2d 723, 723–24 (Colo.App.1981) (IAD's speedy trial provision does not apply to probation violation charge).

We have not before addressed the question of whether the phrase "any untried indictment, information, or detainer" encompasses a detainer filed against a prisoner who has been convicted but not sentenced. Other courts, however, have held that such a prisoner is not faced with "untried" charges, with the result that the IAD does not apply. *Randolph*, 381 N.Y.S.2d at 194; *State v. Barnes*, 471 N.E.2d at 516. In addition, since a defendant who offers a guilty plea that is accepted by the court waives the right to a jury trial, § 16–7–206(3), 8A C.R.S. (1986), and since the court's acceptance of the plea "acts as a conviction for the offense," *id.*, there can be no indictment, information, or complaint remaining to be tried once such a plea has been accepted. Furthermore, in contrast to indictments, informations, and complaints, which are all documents that institute charges against a person, *see People v. Gonzales*, 679 P.2d 1085, 1088 (Colo. 1984) (arrest warrant does not trigger the UMDDA because it does not place charges against an individual), the sentencing process merely finalizes the disposition of charges that have already been tried. Thus, the natural meaning of the language of the IAD and UMDDA suggests that they do not extend to sentencing detainers.

Nor do the purposes underlying the acts warrant such an extension. Both the IAD and the UMDDA reflect a policy of facilitating the speedy disposition of untried charges. *Bost*, 770 P.2d at 1214. Consequently, in *Reed* we concluded that the IAD was inapplicable to a detainer filed against a previously sentenced inmate. 745 P.2d at 240. Because the detainer in that case had been lodged for the purpose of notifying Colorado authorities that upon the inmate's completion of his Colorado sentence he was wanted in the filing state

to serve the remainder of the sentence from which he had escaped, *id.* at 236–37, we characterized the detainer as " 'an internal administrative mechanism' " which did not trigger the IAD's procedural requirements. *Id.* at 240. In contrast to this administrative purpose, the policy of encouraging the speedy disposition of charges arises out of the concern that pending charges "produce uncertainties which obstruct programs of prisoner treatment and rehabilitation." § 24–60–501, art. I. For example, we have stated that

> [u]ntried charges present difficulties to prison authorities and parole boards in formulating a prisoner's rehabilitative program, since such a program must be adopted without knowing whether the prisoner will be convicted on other charges. Pending charges also may adversely affect a prisoner's attitude towards rehabilitation, since the possibility of other convictions makes the prospect of release problematical no matter how zealously a prisoner might work to accomplish his own reform.

*Campbell,* 742 P.2d at 307.[22] Other adverse effects of untried charges include delay in going to trial and inability to prepare for trial while incarcerated. *Id.*

All of these effects have less impact, however, when a prisoner has an outstanding sentencing detainer than when the prisoner has a detainer based on unresolved charges. Although an inmate who pleads guilty or is otherwise convicted of criminal charges may have some uncertainty as to the length of the sentence to be imposed, *see People v. Barnes,* 287 N.W.2d at 283–84, the uncertainty that either the inmate or the prison authorities would have regarding whether the prosecution will ultimately be able to prove unresolved charges is eliminated by a court's judgment of conviction. The procedures of the IAD and UMDDA permit a prisoner to test the merit of pending charges and eliminate any that lack merit, thereby preventing such charges from adversely affecting the conditions of confinement. In contrast, since a "detainer based on [a] pending sentence might [be] replaced by a detainer for the purposes of serving the sentence," the adverse effects upon confinement conditions would be unlikely to change by reason of the change in the nature of the detainer. *Sparks,* 716 P.2d at 257. Accordingly, disposition of a sentencing detainer is likely to have little effect on either the terms of the inmate's prison treatment or on the inmate's rehabilitation. *Id.* Thus, a prisoner faces fewer adverse effects when a detainer arises from a pending sentence than when it is based on an untried charge. *See People v. Barnes,* 287 N.W.2d at 283 ("The uncertainty caused by the delay in sentencing is minimal when compared with the uncertainty resulting from untried charges.") (quoting *People v. Housewright,* 83 Mich.App. 346, 268 N.W.2d 401, 403 (1978)).

An interpretation of the phrase "untried indictment, information, or complaint" to exclude charges that have resulted in conviction with sentence pending also accords with United States Supreme Court precedent. In *Carchman,* 473 U.S. 716, 105

---

**22.** The United States Supreme Court has also noted adverse effects of detainers on inmate rehabilitation programs:

"The inmate who has a detainer against him is filled with anxiety and apprehension and frequently does not respond to a training program. He often must be kept in close custody, which bars him from treatment such as trustyships, moderations of custody and opportunity for transfer to farms and work camps. In many jurisdictions he is not eligible for parole; there is little hope for his release after an optimum period of training and treatment, when he is ready for return to society with an excellent possibility that he will not offend again. Instead, he often becomes embittered with continued institutionalization and the objective of the correctional system is defeated."

*Carchman,* 473 U.S. at 720, 105 S.Ct. at 3403 (quoting Council of State Governments, Suggested State Legislation, Program for 1957, p. 74 (1956)). *See also id.* at 730 n. 8, 105 S.Ct. at 3408 n. 8 (quoting adverse effects of detainers as detailed by Eighth Circuit Court of Appeals in *Cooper v. Lockhart,* 489 F.2d 308, 314 n. 10 (1973)).

S.Ct. 3401, the Court held that the IAD does not apply to a detainer based on a probation-violation charge. Because such a charge does not "accuse an individual with having committed a criminal offense in the sense of initiating a prosecution," it is not encompassed within the phrase "untried indictment, information, or complaint." *Id.* at 725, 105 S.Ct. at 3406. The Court in *Carchman* identified some further policy concerns behind the adoption of the IAD which guide our analysis:

> Adoption of the [IAD] was motivated in part by a practice of filing detainers based on untried criminal charges that had little basis. These detainers often would be withdrawn shortly before the prisoner was released. Even though unsubstantiated, the detainers would have a detrimental effect on the prisoner's treatment. Article III enables a prisoner to require the State lodging the detainer either to drop the charge and resulting detainer or to bring the prisoner to trial. In this way, the prisoner can clear his record of detainers based on unsubstantiated charges.

> A probation-violation detainer, however, generally, as in the present case, will be based on the prisoner's commission of the crimes that resulted in his conviction and incarceration in the sending State. Because the convictions conclusively establish the probation violation, the probation-violation charge will not be unsubstantiated. Thus, the abuses that in part motivated adoption of the [IAD] generally do not occur in the context of probation-violation detainers.

473 U.S. at 729–31, 105 S.Ct. at 3408–09 (citation omitted) (footnotes omitted). So

too, following a defendant's conviction pursuant to the entry of a guilty plea, there remains no cause for concern that the charge is unsubstantiated.

 Based on the language of the IAD and the UMDDA, in addition to the general policies that underlie the acts, we conclude that a detainer placing a hold on a prisoner based on an unresolved sentencing determination in another jurisdiction arising from charges for which the prisoner has already been convicted does not trigger the procedural requirements of either the IAD or the UMDDA. We therefore conclude that the trial court correctly ruled that the acts did not require the dismissal of the charges in Moody's case.[23]

### C

Moody next contends that even if the IAD and UMDDA are inapplicable to his case, the prosecution should have obtained his return to Pueblo through extradition proceedings. Specifically, he urges us to find that the prosecutors had a duty to return him to Pueblo upon learning of his whereabouts in Nebraska, and that they improperly declined to invoke the extradition process to do so. We reject this argument in accordance with our conclusion that Moody's speedy trial rights were not violated by the delays in conducting the sentencing hearing.

 Article IV, Section 2(2), of the United States Constitution gives each state the right to obtain the return of fugitives who flee to other states.[24] However, it does not establish a mandatory obligation on the part of any state to secure the return of such a person. Rather, the deci-

---

**23.** Moody also argues that the Pueblo County action must be dismissed because, in his view, the prosecution's failure to obtain his presence in Pueblo after having indicated through correspondence with him that it intended to do so under Article IV of the IAD, constituted a failure to accept his temporary custody. Section 24–60–501, art. V(c), requires the dismissal of pending charges if an authority that has sought a prisoner's temporary custody for the purpose of resolving an "untried indictment, information,

or complaint" refuses to accept such custody. Our interpretation of this phrase above, however, precludes Moody from obtaining relief on this basis.

**24.** The Uniform Criminal Extradition Act, § 16–19–101 to –132, 8A C.R.S. (1986 & 1992 Supp.), sets forth the procedures that Colorado follows to implement this right of sister states.

sion to extradite is discretionary, as it requires consideration of "the seriousness of the offense and the cost of extradition." *People v. Thompson,* 793 P.2d 1173, 1176 (Colo.1990); *see also Massey v. Wilson,* 199 Colo. 121, 124–25, 605 P.2d 469, 471 (1980) ("Since the right to obtain extradition of [a] fugitive rests with the [requesting state], that state can also decide that it does not want to exercise its right at any time before the prisoner is returned."). Absent a showing that the prosecution violated Moody's right to speedy trial and therefore abused its discretion in not invoking its extradition right, we must reject Moody's argument. Pursuant to our determinations above that neither Moody's statutory nor his constitutional speedy trial rights were violated, we find no error in the district court's decision that Moody's extradition argument did not support a right to habeas corpus relief.

### D

■ As in his previous assertions of error, Moody bases his next argument for reversal on the prosecution's alleged failure to secure timely sentencing. He contends that the Pueblo prosecutors violated the mandate of Crim.P. 32(b), which states that "[s]entence shall be imposed without unreasonable delay." Although the General Assembly has not established any specific time period within which a sentence must be imposed, we have stated that absent a "legally justifiable reason ... a one year deferral of imposition of sentence ... con-

stitutes an unreasonable delay" in contravention of the rule. *People ex rel. Gallagher v. District Court,* 632 P.2d 1009, 1012 (Colo.1981). Unlike the facts in *Gallagher,* however, on which we found no justifiable reason for the delay and consequently ordered the prompt imposition of sentence, we hold that the delay in this case was excusable since the majority of it was attributable to Moody's own actions.

### E

In Moody's following arguments, he focuses on the habeas corpus proceedings themselves and asserts that particular errors in those proceedings warrant a reversal of the district court's decision to discharge the writ. We disagree.

Moody contends that the judge who presided over both his habeas corpus and substantive criminal actions erred in not recusing himself from deciding the habeas corpus case. Pursuant to C.R.C.P. 97, Moody filed a motion and supporting affidavit [25] seeking the judge's recusal. As grounds for recusal, he asserted that the court lacked jurisdiction to proceed in the habeas corpus action, that the judge's rulings reflected prejudice against Moody and were intended to deprive him of due process and equal protection of the law, that he had named the judge as a defendant in a civil action in federal court,[26] and that the judge's continued involvement in the case would constitute a violation of Canon 3C(1)(a) of the Colorado Code of Judicial Conduct.[27] The judge denied Moody's mo-

**25.** Moody had made two previous requests for the judge's recusal in which he asserted that it was improper for the judge to preside over his habeas corpus action while also presiding over the criminal action against him. He had also contended that a comment by the judge to the effect that Moody was "playing games" evinced his prejudice in the case. *See infra* note 29. Moody withdrew both of these earlier requests.

**26.** Pursuant to 42 U.S.C. § 1983 (1988), Moody had filed an action against the trial judge and two prosecutors claiming that their actions violated his constitutional rights. With respect to his claims against the judge, Moody alleged that the judge was prejudiced but did not recuse

himself and that he impermissibly merged a hearing on the habeas corpus and substantive criminal cases. Upon the recommendation of a United States magistrate that the federal court was without authority to grant Moody's requested declaratory relief, the federal district court issued an order on June 21, 1991, dismissing Moody's action for failure to state a claim upon which relief may be granted.

**27.** Canon 3C(1)(a) states:

(1) A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

tion, concluding that the facts that Moody alleged in his motion and affidavit were "legally insufficient" to require disqualification. We agree with that conclusion.

 C.R.C.P. 97 provides in pertinent part:

A judge shall be disqualified in an action in which he is interested or prejudiced, or has been of counsel for any party, or is or has been a material witness, or is so related or connected with any party or his attorney as to render it improper for him to sit on the trial, appeal, or other proceeding therein.

The question of whether a judge should be disqualified from a civil case is a matter within the discretion of the trial court, *Wright v. District Court*, 731 P.2d 661, 664 (Colo.1987) (quoting *Johnson v. District Court*, 674 P.2d 952, 955 (Colo.1984)), resolution of which will not be disturbed on appeal unless it constitutes an abuse of discretion. *In re Marriage of Mann*, 655 P.2d 814, 818 (Colo.1982). The determination of the legal sufficiency of a motion and affidavit seeking disqualification, however, is subject to an independent review by an appellate court. *Smith v. District Court*, 629 P.2d 1055, 1056 (Colo.1981). In ruling on the sufficiency of a motion for disqualification, a judge must accept the factual statements contained in the motion and affidavits as true and determine as a matter of law whether they allege legally sufficient facts for disqualification. *S.S. v. Wakefield*, 764 P.2d 70, 73 (Colo.1988). Consequently, we must consider the sufficiency of Moody's allegations.

 The test of whether a motion is legally sufficient to require a judge's disqualification is whether the motion and affidavits " 'state facts from which it may reasonably be inferred that the judge has bias or prejudice that will prevent him from dealing fairly' with the party seeking recusal." *Wright*, 731 P.2d at 665 (quoting *Johnson*, 674 P.2d at 956); *accord Wake-*

*field*, 764 P.2d at 73; *Rodriguez v. District Court for City and County of Denver*, 719 P.2d 699, 703 (Colo.1986). "Unless a reasonable person could infer that the judge would in all probability be prejudiced against the petitioner, the judge's duty is to sit on the case." *Smith*, 629 P.2d at 1056.

 The allegations set forth in Moody's motion and affidavit provide no reasonable basis for concluding that the trial judge was in any way biased or prejudiced against him. The fact that Moody named the judge as a defendant in a civil action, complaining of some of the same judicial conduct that provided the basis for Moody's recusal motion, is not sufficient to create a reasonable inference of prejudice. *See In re Winslow*, 107 B.R. 752, 753–54 (D.Colo.1989) (affirming bankruptcy judge's decision to recuse himself but stating that a party's "filing of a complaint with the Judicial Council is not grounds for disqualification"); *Mann*, 655 P.2d at 818 (fact that litigant had filed a complaint against the judge with the Judicial Qualifications Commission insufficient to establish bias requiring disqualification); *Kostal v. People*, 160 Colo. 64, 69–70, 414 P.2d 123, 126–27 (1966) (trial judge committed no error in denying motion to disqualify which was based on allegation that the judge was "interested" in having defendant found guilty because defendant had filed federal and state court actions seeking damages from the judge), *cert. denied sub nom. Kostal v. Colorado*, 385 U.S. 939, 87 S.Ct. 305, 17 L.Ed.2d 218 (1966). Nor do Moody's conclusionary statements that the judge was biased and that the court lacked jurisdiction show that disqualification was required. *See Wakefield*, 764 P.2d at 73 (mere opinions or conclusions, unsubstantiated by facts supporting a reasonable inference of bias or prejudice, are not legally sufficient to require disqualification); *Drake*, 748 P.2d at 1249 ("mere speculative statements and conclusions are insufficient

(a) A judge has a personal bias or prejudice concerning a party, or personal knowledge of

disputed evidentiary facts concerning the proceeding.

to satisfy [party's burden of proving bias]"). We therefore affirm the district court's denial of Moody's recusal motion.

## F

Moody argues next that the district court improperly merged the civil habeas corpus action with the substantive criminal proceeding and thereby denied him due process of law. Based on our review of the record, which shows that the two actions were not in fact joined and that Moody was not denied a full opportunity to have his civil action heard, we reject his assertion of error.

Upon being returned to Pueblo, Moody filed a motion to dismiss the criminal action in which he was about to be sentenced, for lack of speedy prosecution. This was the same basis upon which he sought relief in his petition for writ of habeas corpus. The district court therefore determined that since the speedy trial issues in the two cases were identical, resolution of the one case would necessarily resolve the issue in the second case. The court also made clear, however, that Moody would not be precluded from presenting necessary evidence in either the habeas corpus or the criminal action. Adding to this the fact that Moody's attorney argued for dismissal of the criminal action at a hearing separate from that at which Moody argued for habeas corpus relief requires a conclusion that there was no improper consolidation of the two actions. Thus, we reject Moody's argument that the district court's decision must be reversed because of an improper merger of the civil and criminal actions.

## G

In his next two arguments, Moody specifically focuses on the conduct of the trial judge and urges us to find that it was so improper that the decision to discharge the writ of habeas corpus must be reversed. Moody first asserts that he was coerced into withdrawing his motions for recusal [28] when the judge made statements that he thought Moody was "playing games" with respect to his motions and that he intended to resolve those motions the same way for both the habeas corpus and criminal actions.[29] We are satisfied that neither of these comments had the potential for any improper effect on Moody's decision to withdraw his motions for recusal. To the extent that there was any error, however, at most it can only be considered harmless.

■ Under C.R.C.P. 61 and C.A.R. 35(e), a reviewing court must disregard any error that does not prejudice "the substantial rights" of a party. An error affects a substantial right when it can be said with fair assurance that it substantially influenced the outcome of the case or impaired the basic fairness of the trial itself. *Banek v. Thomas*, 733 P.2d 1171, 1178 (Colo.1986). Thus, a trial court's judgment will not be reversed unless the party challenging the judgment shows the existence of error and that the error had a prejudicial effect. *Poudre Valley Rural Elec. Ass'n v. City of Loveland*, 807 P.2d 547, 557–58 (Colo. 1991); *Banek*, 733 P.2d at 1178. In this case, Moody submitted a subsequent motion for recusal which included the assertions that he had made in his two previously withdrawn motions. The fact that the district court considered these allegations and ultimately resolved the motion shows that Moody had an opportunity to present his claims and, thus, was not coerced into

---

28. See *supra* note 25.

29. When Moody filed his first written motion for recusal in the habeas corpus action, he indicated that he wanted the judge to continue presiding over the criminal action. The judge responded by stating:

THE COURT: Well, Mr. Moody, that is totally inconsistent, because what you are saying to me is that I am not being fair with you on one and what you are going to do is wait until we get through with the other hearing and then file a motion for recusal. No, you are not going to do that with me, because I will consider this a motion in both cases, and I have had a chance to look at it and rule on it. You are not going to play games with me.

. . . .

I am vacating both hearings on the basis that I will make a determination on whether or not I should recuse, because if I recuse on one, I will recuse in the other.

forgoing his arguments by the judge's statements. Therefore, he has established no prejudice from the withdrawal of the earlier motions.

Moody also contends that the trial judge gave him erroneous advice on the proper manner of filing a motion for recusal. Specifically, he argues that the judge told him that he needed two affidavits to support his motion, and since C.R.C.P. 97 requires only one affidavit, he urges us to find that this advisement requires the reversal of the district court's decision. We disagree.

The record shows that when Moody made an initial oral motion for recusal, the trial judge advised him on the proper manner of filing such a request in both the habeas corpus and criminal actions.[30] In so doing, the judge correctly stated that C.R.C.P. 97 requires "a written motion and affidavit." To the extent that there could have been any misunderstanding, however, the fact that Moody was provided with copies of the relevant rules, taken together with the court's acceptance and subsequent ruling on his motion, shows that there was no adverse impact on Moody's substantial rights. Consequently, his assertions of error are insufficient to establish a basis for reversing the court's discharge of the writ.

H

In his last two assignments of error, Moody asserts that he was denied meaningful access to the court in preparing for his habeas corpus proceeding. Specifically, he asserts that authorities at the jail refused to mail an amendment to a motion for a new trial which he had filed after the dis-

trict court discharged the writ and that as a result, he was denied the opportunity to present to the court the issues set forth in the amendment. He also asserts that he could not adequately research and prepare his pleadings because the library at the Pueblo County jail lacked sufficient legal materials. We disagree with both contentions and conclude that Moody was not denied his right of access in preparing his case.

The United States Supreme Court has long recognized that prisoners have a fundamental constitutional right of access to the courts and that states must assure indigent defendants "an adequate opportunity to present [their] claims fairly." *Bounds v. Smith,* 430 U.S. 817, 821, 823, 828, 97 S.Ct. 1491, 1494, 1495, 1498, 52 L.Ed.2d 72 (1977) (quoting *Ross v. Moffitt,* 417 U.S. 600, 616, 94 S.Ct. 2437, 2447, 41 L.Ed.2d 341 (1974)); *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971). As part of this right a state must provide inmates, at state expense, "with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them." *Bounds,* 430 U.S. at 824–25, 97 S.Ct. at 1496. Inmates are also entitled to "adequate law libraries or adequate assistance from persons trained in the law" in order to assist them "in the preparation and filing of meaningful legal papers." *Id.* at 828, 97 S.Ct. at 1498;[31] *see also Hernandez v. District Court,* 194 Colo. 25, 26, 568 P.2d 1168, 1168 (1977) (relying on *Bounds* to find state prisoner entitled to "reasonable access to the prison law library" to prepare for proceedings in charges lodged against him). The question in any particular case

---

**30.** Crim.P. 21 requires that a motion for recusal in a criminal action be accompanied by two supporting affidavits whereas C.R.C.P. 97, which applies in civil proceedings, requires only one affidavit.

**31.** In *Bounds,* the Court went on to note that access to an adequate law library is but one method by which a state can protect an inmate's right to court access and that there may be alternative means, including use of law students, volunteer attorneys, or paraprofessionals,

to meet this goal. *Bounds,* 430 U.S. at 830–31, 97 S.Ct. at 1499–500; *see also Ramos v. Lamm,* 639 F.2d 559, 583 (10th Cir.1980) (states are free to choose among a variety of methods in meeting their constitutional obligations), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Hampton v. Schauer,* 361 F.Supp. 641, 642–43 (D.Colo.1973) ("prison library is but one factor in the totality of all the factors bearing upon the inmates' access to the courts").

is whether a prison's facilities and rules, when considered as a whole, provide inmates with "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds,* 430 U.S. at 825, 97 S.Ct. at 1496; *see also Colo. Const.* art. II, § 6 (guaranteeing to every person the right of access to courts of justice).[32]

Moody asserts that between June 13, 1991, and June 20, 1991, authorities at the county jail refused to provide him with stamps to mail his legal correspondence and that he was consequently unable to amend his motion for a new trial. The record shows, however, that in response to Moody's motion for court-ordered service the sheriff agreed to provide Moody with postage for legal mail during any time in which he had insufficient funds to make his own purchases. The fact that it also shows that Moody had money in his account which he could have spent on mailing fees prevents a finding that he required the State's assistance in presenting his motion to the district court. For instance, in Moody's reply to the sheriff's response, he concedes that he had over $80.00 in his account when he entered the Pueblo County jail on February 19, 1991, and that subsequent deposits gave him a total of over $140.00. Furthermore, Moody's own documentation, which he attached to his reply, indicates that he had an outside funding source and that this was the reason for the sheriff's denial of his requests for State assistance. Moody also concedes that he spent much of his money on snacks and cigarettes (for himself and in repayment of loans made by other inmates). The fact that he chose to make such purchases, rather than spend his money on mailing expenses, precludes us from finding that he was improperly denied the ability to mail legal documents. Moreover, Moody has made no showing that he was precluded from presenting any particular argument to the district court and therefore has demonstrated no prejudice.

In addressing Moody's argument that the library facilities at the jail were inadequate to provide him with meaningful court access, the lack of any specifics in the record as to the library's actual contents limits our ability to review his claim. Even assuming that there may have been some inadequacies, however, we believe that the district court, by allowing Moody use of the courthouse library, by giving him copies of relevant procedural rules, and by granting him extensions of time to research and prepare his arguments assured that Moody's right to meaningful court access was upheld. There being no evidence showing that Moody was hindered in presenting his case to the court because of inadequate library facilities, *see Hampton,* 361 F.Supp. at 642, we reject his assignment of error.

## VI

We conclude that the delay in returning Moody to Pueblo for sentencing on the conviction of the charges that were first instituted in 1983 did not amount to a violation of either his statutory or constitutional rights to speedy trial and that Moody established no right to relief under the IAD, the UMDDA, the extradition act, or Crim.P. 32(b). Moreover, we conclude that the trial judge did not err in denying Moody's motion for recusal, that he did not improperly merge the habeas corpus and criminal actions, that his conduct during the habeas corpus proceedings did not require reversal of his decision, and that action on the part of Pueblo authorities did not deny Moody his constitutional right of access to the courts. We therefore affirm the district court's discharge of the writ of habeas corpus.

MULLARKEY, J., concurred in the result only.

---

**32.** Moody's briefs to this court do not make clear whether his contention that his right to meaningful court access was violated is based on federal or state constitutional guarantees. In light of the absence of evidence showing either that Moody needed state assistance to present his arguments to the district court or that inadequacies in the jail's library facilities prejudiced his ability to present his case, we are satisfied that Moody was fully accorded his rights under both constitutions.

ERICKSON, J., filed a special concurrence in the result and was joined by ROVIRA, C.J., and VOLLACK, J.

Justice ERICKSON specially concurring in the result:

I agree with the majority that the district court's discharge of the writ of habeas corpus should be affirmed. However, in my view, the availability of other possible legal recourse at the time Moody instituted the habeas corpus action precluded issuance of the writ as premature and there is consequently no need to address Moody's assertions of error. *See Kodama v. Johnson,* 786 P.2d 417 (Colo.1990); *Mulkey v. Sullivan,* 753 P.2d 1226 (Colo.1988).

I also write separately because I am troubled by the majority's resolution of the speedy trial issue. I do not concur with the majority's conclusion that the fact that Moody pled guilty and that the district court accepted the pleas does not preclude his constitutional challenges. Maj. op. at 1363. Instead, I agree with the jurisdictions that have held that the right to a speedy trial guaranteed by the Sixth Amendment to the United States Constitution does not extend to the sentencing stages of a criminal prosecution. *See, e.g., State v. Drake,* 259 N.W.2d 862 (Iowa 1977); *State v. Johnson,* 363 So.2d 458 (La.1978).[1] There is no need to engage in the ad hoc balancing test of *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in a case such as this, where the defendant pled guilty and subsequently fled the jurisdiction prior to sentencing.

The constitutional right to a speedy trial "is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." *United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966). However, none of the concerns underlying the right to a speedy trial are implicated in a situation where the accused has already pled guilty and is awaiting sentencing. *See Brooks v. United States,* 423 F.2d 1149, 1152–53 (8th Cir.), *cert. denied,* 400 U.S. 872, 91 S.Ct. 109, 27 L.Ed.2d 111 (1970); *Johnson,* 363 So.2d at 460–61.

Although certain rights guaranteed by the Sixth Amendment of the United States Constitution, such as the right to counsel, apply to the sentencing phase of a criminal prosecution, the Sixth Amendment right to a speedy trial does not, under the facts of this case, apply to sentencing. In my view, the right to a speedy trial does not guarantee a speedy sentencing procedure to a defendant who has pled guilty and then has fled from the jurisdiction.

I am authorized to say that Chief Justice ROVIRA and Justice VOLLACK join in this special concurrence in the result.

---

1. The majority recognizes that the United States Supreme Court has not spoken definitively on the issue of whether a criminal defendant's right to a speedy trial under the federal constitution extends through the sentencing phase of the prosecution. Maj. op. at 1363; *see Pollard v. United States,* 352 U.S. 354, 361, 77 S.Ct. 481, 485, 1 L.Ed.2d 393 (1957).