22CA1180 Peo v Ortega 09-04-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1180
City and County of Denver District Court No. 18CR7901
Honorable Eric M. Johnson, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Kevin T. Ortega,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE FREYRE
Gomez and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 4, 2025

---

Philip J. Weiser, Attorney General, Alejandro Sorg Gonzalez, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Gregory Lansky, Alternate Defense Counsel, Aurora, Colorado, for Defendant-Appellant

¶ 1     Defendant, Kevin T. Ortega, appeals his convictions for first degree assault, attempted aggravated robbery, and unlawful discharge of a firearm.  He also appeals his habitual criminal adjudication and sentencing.  We affirm the convictions and sentence.

## I.     Background

¶ 2     On July 31, 2017, John David Baker III was driving with Ortega's sister, Alicia,[1] when she received a call from Ortega.  Baker and Alicia had socialized only a couple of times since meeting in 2013.  During the call, Ortega asked Baker to meet up with him and Baker agreed.

¶ 3     When Baker arrived at the meeting location, Ortega was with three men that Baker did not know.  Baker texted David Manzanares, a man from whom he had previously purchased drugs, to buy more.  Ortega testified that he had also purchased drugs from Manzanares previously, but Manzanares denied ever having met Ortega before this incident.  Ortega asked Baker what Manzanares could get, and Baker told him "everything."  Ortega

---

[1] Alicia shares the same last name as the defendant.  Therefore, we refer to her by her first name.  We mean no disrespect in doing so.

then told Baker "let's go."  Baker texted Manzanares that he was coming to his house, but he did not say that other people were coming with him.[2]

¶ 4    Baker, Ortega, and the other three men then drove to Manzanares's house.  During the ride, Ortega lifted his shirt and showed Baker a .45 caliber gun.  Baker was not armed.  When they arrived, they parked two blocks from Manzanares's house.  Manzanares was not yet home.

¶ 5    After sitting in the car for a few minutes, Baker and Ortega walked toward Manzanares's house.  Manzanares arrived in Antonia Perez's car shortly thereafter.  Perez was driving and Manzanares was in the passenger seat.  When Manzanares exited the car, Baker told Manzanares to give him what he had.  Manzanares said that he did not have anything.  Baker then demanded that Manzanares give him drugs, and Manzanares refused.  Ortega then shot Manzanares three times.  When he ran out of bullets, Ortega pistol-whipped Manzanares in the face.

---

[2] Alicia left separately when the men left and is not part of this case.

¶ 6    Perez then exited the car and ran down the street.  Ortega ran after her and dragged her back to the car.  Ortega pistol-whipped Perez in the face and took her phone while Baker went through Manzanares's pockets.  Baker immediately grabbed Perez's phone from Ortega.  Ortega and Baker then left and threw Perez's phone into the sewer as they drove away.

¶ 7    Manzanares identified Baker as the man who had demanded money and told police that he was shot by another man.  The following day, the police arrested Baker.  While hospitalized, Manzanares told the police that he found a photo of the shooter on Facebook.  Manzanares identified V.G. as the shooter.  He said, "[T]hat's the face I remember," and "you can't forget something like that."  Baker was in the photo with V.G., but he later testified that he did not know V.G.

¶ 8    The police recovered Ortega's fingerprints from Perez's car.  Perez and her sister said that they did not know Ortega and that there was no reason for his fingerprints to be on the car.  Several months later, Baker identified Ortega as the shooter.  The State charged Ortega with criminal attempt to commit murder in the first degree, first degree assault, aggravated robbery, second degree

assault, bodily injury with a deadly weapon, criminal attempt to commit aggravated robbery, and illegal discharge of a firearm.

¶ 9 At trial, defense counsel argued that the shooter was V.G., the man Manzanares identified at the hospital shortly after the shooting. Ortega testified, denied all the charges against him, and argued that he was not present at the shooting.

¶ 10 The jury convicted Ortega of first degree assault, attempted aggravated robbery, and illegal discharge of a weapon, but it acquitted him on all other charges. The trial court adjudicated Ortega a habitual offender and sentenced him to sixty-four years in the custody of the Department of Corrections.

¶ 11 On appeal, Ortega contends that the trial court (1) violated his statutory and constitutional speedy trial rights; (2) errantly permitted prosecutorial misconduct; (3) impermissibly changed the jury instructions after deliberations had commenced; and (4) improperly admitted evidence that fingerprint comparison conclusions were verified by a nontestifying witness. He also contends that insufficient evidence supports his habitual criminal adjudication and sentence. We affirm.

## II.     Speedy Trial

¶ 12     Ortega contends that the trial court violated his statutory and constitutional speedy trial rights.  We conclude that Ortega waived the statutory speedy trial issue by not properly preserving it.  We further conclude that there was no violation of Ortega's constitutional right to a speedy trial.

### A.     Additional Facts

¶ 13     On January 28, 2019, Ortega pleaded not guilty.  After both parties moved for several continuances to try to reach a disposition, the trial court set a trial date.

¶ 14     Ortega's original counsel then withdrew, and Ortega waived his speedy trial rights so that substitute counsel could review the case.

¶ 15     Substitute counsel withdrew Ortega's not guilty pleas to reset the speedy trial deadline.  After further unsuccessful attempts to reach a disposition, the trial court set a trial date for March 10, 2020.

¶ 16     On March 10, 2020, after receiving new evidence, substitute counsel moved for a continuance.  The trial court granted the

continuance, reset the trial date to July 27, 2020, and noted a new speedy trial deadline of September 10, 2020.

¶ 17    On July 17, 2020, the trial court declared a mistrial due to COVID-19. Ortega objected and asserted his statutory speedy trial rights. The court overruled his objection, reset the trial to September 29, 2020, and noted the new speedy trial deadline of November 13, 2020.

¶ 18    On September 11, 2020, the prosecution moved for a continuance based on an inability to subpoena two witnesses. Ortega objected based on his statutory speedy trial rights. The trial court overruled his objection and reset the trial to January 19, 2021.

¶ 19    On January 19, 2021, the trial court declared a mistrial due to COVID-19. Ortega objected based on his statutory speedy trial rights. The court overruled his objection, reset the trial to March 15, 2021, and noted a new speedy trial deadline of May 27, 2021.

¶ 20    On March 19, 2021, the prosecution moved for a second continuance because Ortega had a conflicting jury trial date in another jurisdiction. Ortega objected. The trial court overruled his

objection, granted the continuance, and reset the trial date within the existing speedy trial deadline.

¶ 21    Ortega's trial commenced on May 11, 2021.

### B.    Statutory Speedy Trial

¶ 22    Colorado's speedy trial statute requires that a defendant be brought to trial within six months of entering a plea of not guilty. § 18-1-405(1), C.R.S. 2025.  The remedy for a violation of a defendant's statutory speedy trial rights is dismissal of the charges with prejudice.  *People v. Taylor*, 2020 COA 79, ¶ 18.  But to obtain relief based on a violation of this statute, a defendant must move for dismissal before trial.  § 18-1-405(5); *see also People v. Desantiago*, 2014 COA 66M, ¶ 14.  "Failure to so move is a waiver of the defendant's rights under [the speedy trial statute]."  § 18-1-405(5); *see People v. Abdu*, 215 P.3d 1265, 1269 (Colo. App. 2009) (noting the defendant's statutory speedy trial challenge "is barred because [the] defendant never moved to dismiss the case on speedy trial grounds").

¶ 23    The record shows that neither Ortega nor his counsel moved to dismiss the case on speedy trial grounds before his trial began. To the extent Ortega argues in supplemental briefing that an

objection is the functional equivalent of a motion to dismiss and sufficiently preserves the issue for appellate review, we disagree. The plain language of section 18-1-405(5) requires that the defense move to dismiss. *See Abdu*, 215 P.3d at 1269 (appellate challenge to statutory speedy trial violation barred because defendant never moved to dismiss the case on speedy trial grounds); *People v. Munoz*, 240 P.3d 311, 321 (Colo. App. 2009) (a defendant must move to dismiss before trial in order to receive relief for a trial court's failure to comply with the statutory speedy trial rule, and failure to do so results in the waiver of this right). Because we conclude that Ortega waived his statutory speedy trial rights, we do not address his statutory speedy trial claim on the merits. *See Moody v. Corsentino*, 843 P.2d 1355, 1362 (Colo. 1993).

## C. Constitutional Speedy Trial

¶ 24 Ortega did not raise his constitutional speedy trial right in the trial court. However, unpreserved constitutional errors may be reviewed for the first time on appeal. *Reyna-Abarca v. People*, 2017 CO 15, ¶ 37. Accordingly, we review Ortega's constitutional speedy trial claim for plain error. *People v. Rediger*, 2018 CO 32, ¶ 47.

## 1. Applicable Law

¶ 25    The United States and Colorado Constitutions guarantee all criminal defendants the right to a speedy trial. U.S. Const. amend. VI; Colo. Const. art. II, § 16; *Moody*, 843 P.2d at 1363. We apply a four-factor balancing test to assess whether a defendant's constitutional speedy trial rights were violated and consider the following: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of the right; and (4) the prejudice to the defendant. *Moody*, 843 P.2d at 1363 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)); *see also People v. Chavez*, 779 P.2d 375, 376 (Colo. 1989) (noting the *Barker* test also governs the determination of a speedy trial claim under the Colorado Constitution). The defendant bears the burden of establishing that his constitutional speedy trial rights have been denied. *Moody*, 843 P.2d at 1363.

## 2. Analysis

¶ 26    Analyzing the four *Barker* factors, we conclude that the trial court did not violate Ortega's constitutional right to a speedy trial.

¶ 27    Here, the length of the delay between Ortega's not guilty pleas and his convictions totaled 841 days. The People concede, and we

agree, that this is presumptively prejudicial and weighs in favor of the conclusion that Ortega's constitutional speedy trial rights were violated.

¶ 28    Regarding the second *Barker* factor, Ortega contends that the reasons for the lengthy delays were not attributable to him and that the court erroneously granted the prosecution's trial continuance motions.  We are not persuaded for four reasons.  First, on two occasions, the trial court declared a mistrial due to COVID-19. Delays caused by the COVID-19 pandemic cannot "fairly be attributed" to either the government or Ortega.  *United States v. Keith*, 61 F.4th 839, 853 (10th Cir. 2023).  COVID-19 is a "truly neutral justification — not favoring either side."  *Id.*

¶ 29    Second, the defense moved for continuances to substitute new counsel and to provide counsel sufficient time to review the evidence and prepare for trial.  These continuances are attributable to the defense and weigh against a constitutional violation.  *See* § 18-1-405(6) (scheduling delays to accommodate defense counsel are attributable to the defendant).

¶ 30    Third, the record reveals that both sides requested continuances in an attempt to reach a disposition but were

unsuccessful in reaching one. We conclude that these delays are neutral and do not weigh for or against either side. *See People v. Bell*, 669 P.2d 1381, 1386 (Colo. 1983) (delays resulting from efforts to negotiate a plea bargain will be charged to the party seeking the disposition).

¶ 31 Fourth, the remaining delays were due to (1) the unavailability of the prosecution's witness and (2) Ortega's conflicting jury trial in another jurisdiction. Witness unavailability is a valid reason for delay. *See Barker*, 407 U.S. at 531 (a valid reason, such as a missing witness, should serve to justify appropriate delay). Moreover, despite the delay due to Ortega's conflicting jury trial in another jurisdiction, Ortega's trial commenced within the speedy trial deadline. Therefore, this factor weighs against a constitutional violation.

¶ 32 Concerning the third *Barker* factor, Ortega asserted his right to a speedy trial. This factor weighs in Ortega's favor.

¶ 33 Finally, concerning the fourth *Barker* factor, we conclude that Ortega has not shown he was materially prejudiced by the delay. Prejudice is assessed by weighing three interests that the right to speedy trial protects: "(i) to prevent oppressive pretrial

incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Moody*, 843 P.2d at 1367 (quoting *Barker*, 407 U.S. at 532). "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

¶ 34    Ortega contends that he was prejudiced by the delay because (1) his lengthy incarceration was dangerous for him due to the high COVID-19 infection rate at the jail and the fact that he suffered from serious health and respiratory issues, including life-long asthma; (2) his wife was struggling at home with child care and work; (3) he was not able to see or hold his young daughter who was born just before he was incarcerated; (4) he was very anxious and suffered great harm waiting for his case to proceed to trial; and (5) the delay impaired his defense as he had recollection issues during his trial testimony due to the passage of time.

¶ 35    While we recognize the impact of Ortega's lengthy incarceration and the unusual circumstances under which it occurred, we note that Ortega did not explain how the delay caused him any more anxiety or concern than the average criminal

defendant, and that he failed to provide any specific examples of how his anxiety, concern, or distress resulted in prejudice. *See People v. Valles*, 2013 COA 84, ¶ 50; *see also People v. Nelson*, 2014 COA 165, ¶ 41 (noting that the defendant "presented no evidence or offer of proof to establish any such anxiety or concern beyond that normally to be expected from the fact of a criminal prosecution").

¶ 36 Additionally, the record shows that none of the delays were attributable to Ortega's incarceration or health-related issues (like the contraction of the COVID-19 virus). It also shows that Ortega was able to review the evidence in the case and to refresh his memory in preparation for his trial testimony. On balance, we conclude that while the delay was presumptively prejudicial, Ortega has not demonstrated prejudice because of the delay.

¶ 37 Accordingly, Ortega's constitutional right to a speedy trial was not violated.

### III. Prosecutorial Misconduct

¶ 38 Ortega next contends that the prosecutor committed misconduct during his rebuttal closing argument. We disagree.

## A. Standard of Review and Applicable Law

¶ 39 Whether a prosecutor's statement constitutes misconduct is left to the trial court's discretion. *Domingo-Gomez v. People,* 125 P.3d 1043, 1049 (Colo. 2005). We will not disturb the court's rulings regarding such statements absent a showing of an abuse of that discretion. *People v. Strock,* 252 P.3d 1148, 1152 (Colo. App. 2010). A trial court abuses its discretion only when its ruling is manifestly arbitrary, unreasonable, or unfair or misapplies the law. *People v. Muniz,* 190 P.3d 774, 781 (Colo. App. 2008).

¶ 40 Ortega preserved one prosecutorial misconduct argument by lodging a contemporaneous objection during the prosecutor's rebuttal argument. We review this preserved contention for nonconstitutional harmless error. *See People v. Ortega,* 2015 COA 38, ¶ 51. But we review Ortega's remaining contentions for plain error. *See Hagos v. People,* 2012 CO 63, ¶ 14. Reversal under this standard requires that the prosecutorial misconduct be so obvious and so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Walker,* 2022 COA 15, ¶ 28.

¶ 41    We conduct a two-step analysis when reviewing a claim of prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  First, we determine whether the prosecutor's challenged conduct was improper under the totality of the circumstances.  *Id.*  Second, if the prosecutor's comments were improper, we evaluate whether they warrant reversal according to the proper standard of reversal.  *See id.*

¶ 42    We evaluate claims of improper argument in the context of the argument as a whole and consider the evidence before the jury.  *Strock*, 252 P.3d at 1153.  A prosecutor enjoys "wide latitude in the language and presentation style used to obtain justice."  *Domingo-Gomez*, 125 P.3d at 1048.  Because closing arguments delivered in the heat of trial are not always perfectly scripted, we accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful.  *People v. Samson*, 2012 COA 167, ¶ 30.  Even so, prosecutors may not state or imply that defense counsel has presented the defendant's case in bad faith or otherwise make remarks for the purpose of denigrating defense counsel.  *People v. Jones*, 832 P.2d 1036, 1039 (Colo. App. 1991).  The prosecutor may not attempt to shift the burden of proof to the

defendant. *See People v. Santana*, 255 P.3d 1126, 1130 (Colo.

2011). Nor may counsel misstate or misinterpret the law in closing

argument. *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004),

*aff'd*, 119 P.3d 1073 (Colo. 2005).

## B. Analysis

¶ 43     Ortega contends the prosecutor (1) denigrated defense

counsel; (2) shifted the burden of proof; (3) inferred Ortega lied; and

(4) misstated the law. We are not persuaded.

### 1. Denigrating Defense Counsel

¶ 44     We begin with Ortega's preserved contention.

¶ 45     During closing argument, defense counsel argued that the

police stopped investigating V.G. after they found Ortega's

fingerprints on Perez's car, despite Manzanares's identification of

V.G. Counsel argued:

> We don't have to prove that [V.G.] did it, but,
> boy, it sure looked like it, and they stopped.
> They got the fingerprints, and they quit
> investigating him.
>
> . . . .
>
> The prosecution says, "Oh, he was cleared."
> Not – he was not cleared. The investigation
> into – what did she say the investigation was?
> Looking at Facebook, trying to find out who his
> confederates were?

¶ 46    Ortega asserts the prosecutor denigrated defense counsel by

arguing the following on rebuttal:

> *When the evidence is strong, good defense
> attorneys don't lay down in closing arguments.
> They do what [defense counsel] did: they make
> powerful, loud arguments, and they pound the
> podium.* Remember that? It's the police, we're
> coming in, *blah, blah, blah.* Started before the
> opening of evidence.
>
> Defense would have you believe that this was a
> case about police brutality, about police bias,
> about police, police, police. And you've got to
> prove yourself to the police. A week later, is
> that what this case was about? *Are we to
> believe that [defense counsel] didn't know what
> this case was about until opening statements?*
>
> . . . .
>
> Are we to believe that defense counsel didn't
> know what this was about until opening
> statements? "That's the face I remember. You
> don't forget that face." The statement from
> David Manzanares six days after being shot in
> the face, on his kneecaps, in his wrist.
>
> And when you choose to recollect those in the
> terms suggested to you by the defense, it's that
> he was completely lucid. And that's the
> information that defense wants you to rely on.
>
> He said it explicitly. That alone is reasonable
> doubt. The identification of a man who has
> been in the hospital room for six days, who
> they would like you to believe is not on any
> painkillers . . . that because of that, any other

> evidence tying Kevin Ortega to this case
> doesn't matter.

(Emphasis added.)

¶ 47    A prosecutor may not denigrate defense counsel. *People v. Welsh*, 176 P.3d 781, 788 (Colo. App. 2007). Yet a prosecutor also has considerable latitude in replying to defense counsel's arguments, *id.*, and in choosing what language to employ, *People v. Robles*, 302 P.3d 269, 279 (Colo. App. 2011), *aff'd*, 2013 CO 24. We must take into account "defense counsel's opening salvo." *People v. Vialpando*, 804 P.2d 219, 225 (Colo. App. 1990) (quoting *Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987)).

¶ 48    While the prosecutor's comments were perhaps inartful, when read in context, we conclude that they did not constitute a personal attack on defense counsel. *See Samson*, ¶ 30. Instead, they were a permissible response to defense counsel's argument that V.G. was the shooter and an effort to refocus the jury's attention on evidence that Manzanares was on painkillers following surgery when he identified V.G. as the shooter. Prosecutors may comment on the evidence admitted at trial and the reasonable inferences that can be drawn from the evidence. *Welsh*, 176 P.3d at 788; *see also People*

18

*v. Allee*, 77 P.3d 831, 836 (Colo. App. 2003) (prosecutor's remark that the jury should not be distracted by defense tactics was not improper considering the prosecutor was attempting to draw the jury's focus to relevant evidence and did not intend to denigrate defense counsel).

¶ 49    Ortega's remaining denigration arguments were unpreserved.

¶ 50    During closing, defense counsel argued:

- The prosecution withheld video evidence because it harmed the prosecution's case.

- Police ended their investigation into V.G. when they found Ortega's fingerprints on Perez's car. Their subsequent lack of investigation into V.G. showed that the police and the prosecution were biased.

- Baker's recollection of the shooting was inconsistent and established that Ortega was not the shooter.

¶ 51    Ortega alleges the following comments in the prosecutor's rebuttal argument constituted misconduct.

¶ 52    First, the prosecutor stated:

> It's sad. *It's sad when it's suggested to you that defense doesn't have the ability to introduce a video at trial.* And how do you

19

know that's not right? Because they introduced a video at trial. Defense A is a video submitted by the defense."[3]

(Emphasis added.)

¶ 53    Later, the prosecutor continued:

> The suggestion that you should listen to the parts of the previous statements of the videos, which were introduced, and then just fill in the gaps yourself, and that all those gaps lie in Mr. Ortega's favor, and that's the only reason we weren't introducing them, and that they were not presented to you at all.
>
> It wasn't presented to me by either side, so I guess that must be in Kevin Ortega's favor. There's nothing to suggest that. Defense wants you to speculate. The People don't ask jurors to speculate, because it's our burden to provide that. You shouldn't have to speculate.
>
> Defense wants you to speculate because there's a million reasons which might exist. If you don't understand the universe of possibilities of evidence that we're working in, and they want you to think that that universe is bigger than what's in this courtroom. It's not.
>
> That universe is there, and that universe is here. And when you're done fulfilling your duties, you absolutely will ask questions. *You*

---

[3] At trial, Ortega objected to this statement, arguing that the prosecution was shifting the burden. However, he raises it on appeal as denigrating defense counsel. To preserve an argument, a defendant must object on that ground. *People v. Short,* 2018 COA 47, ¶ 53. Therefore, we consider this contention unpreserved.

20

*will find lawyers that say why did this happen, or why did that happen, that was my experience.* And you're welcome to do that. But until that verdict is rendered, this is your universe.

(Emphasis added.)

¶ 54    Second, the prosecutor argued:

Defense wants you to believe that we have bias. And did you catch the argument that he made about that? "They want to find the person that did this." That's not bias. *That's just static,* that's just using the word "bias" and "prosecution" over and over and over again to convince you that this is the case that isn't. That Detective Chavez is framing Kevin Ortega. And you've seen nothing to suggest that's the case.

(Emphasis added.)

¶ 55    Third, the prosecutor said:

And so when he comes up and *when an excellent defense attorney does as [defense counsel] does, and constantly is moving the target,* asking about, well, that's what you said in the proffer, is that what you said in this interview, is that what you said this time? What about when we rolled the tape back three seconds ago? Constantly moving. He don't [sic] know who – which statements he's agreeing with.

Now, maybe in the moment that's lost on the jury, because you guys don't have transcripts and flipping back and forth from and say, oh,

we're on page 14 now, or we're on this, oh, we're on that now, *all you hear is what a skilled attorney wants you to hear*, which is that the witness is confused, doesn't remember what he said last time, doesn't even know which time he's been asked about.  And all he can do is generally agree or not agree.

(Emphasis added.)

¶ 56    In all three instances, when read in context, the prosecutor's comments did not denigrate defense counsel but provided a direct response to defense counsel's closing argument.  *See People v. Ramirez*, 997 P.2d 1200, 1211 (Colo. App. 1999), *aff'd*, 43 P.3d 611 (Colo. 2001).  Here, the prosecutor responded to defense counsel's arguments about (1) the prosecutor's introduction of certain videos and not others; (2) police and prosecutorial bias; and (3) Baker's inconsistencies between the proffer and his trial testimony.  *See Vialpando*, 804 P.2d at 225 (prosecutors are allowed considerable latitude in responding to defense counsel's arguments).  Moreover, the prosecutor did not appeal to the prejudices of the jury or divert the jury from its duty to decide the case based on the evidence.  *See People v. Walters*, 148 P.3d 331, 335 (Colo. App. 2006).  Therefore, we conclude that these comments fall within the considerable latitude afforded to prosecutors in replying to arguments by defense

counsel and thus perceive no misconduct.  *See Ramirez*, 997 P.2d at 1211.

### 2.   Burden Shifting

¶ 57     Ortega next contends that the prosecutor impermissibly shifted the burden of proof to the defense.  In rebuttal the prosecutor argued:

> We have the burden to prove this, but Kevin Ortega is not insulated in terms of how you are able to judge his credibility versus any other witness.  Once he's on that stand, you get to use all the questions that [defense counsel] asked against Mr. Ortega.  Why – what's this gap because of?  Why doesn't he have a better answer for that?  How come we didn't explain this?
>
> It was explained over and over again that [Baker] had 14 months to come up with this. *You heard Mr. Ortega volunteer to his attorney on the stand he had three years to come up with this.*
>
> . . . .
>
> Three years.  And of all the statements that defense tries to murky the water with Mr. Baker, do you notice when the first one comes in?  It's the proffer.
>
> At no point between his arrest and the proffer do you have a statement from [Baker].  But once he gets that far, you have this comparative, all right?  And some of these witnesses that you heard today made multiple

statements, and they have those reasons for that.

And everyone that you heard from who could be impeached with a prior statement you heard at least some impeachment from.  But the protections that Mr. Baker enjoyed between his arrest and his proffer were not individual to Mr. Baker.

Defense counsel pointed out that it wasn't just Mr. Baker who was able to facilitate his story, right?  He had an attorney.  His attorney was talking to the DA.  When it comes to credibility and credibility only, you can ask those same questions for Mr. Ortega.

And you know it's not just him during those three years that can come up with this information.  He's got an attorney; he's got an investigator; he's got a paralegal; he's got Alicia Ortega; he's got his boss, his friends, his family; the power of the court and [defense counsel] to subpoena records.

*And to sit for three years and not be able to find that information, I agree, has got to be frustrating, but it's the reason.  Because viewing those things requires evidence, requires information which does not exist.*

*. . . .*

*Why can't [Ortega] find someone to say that he was with – or that person was with him that night?  You could believe Mr. Ortega, which I just can't remember, and there's no way for me [to] backtrack that.  And again, this is only for credibility, because we have the burden.*

24

> *Or that information doesn't exist for another reason. Because he'd have to get someone to come up here and perjure themselves in order to have that witness available, because we'd have to create evidence that made that.*

(Emphasis added.)

¶ 58 A prosecutor is allowed considerable latitude in responding to arguments made by opposing counsel. *Ramirez*, 997 P.2d at 1211. However, a prosecutor may not attempt to shift the burden of proof to the defendant. *People v. Marko*, 2015 COA 139, ¶ 225, *aff'd on other grounds*, 2018 CO 97. A prosecutor may comment on the lack of evidence supporting a defense theory. *Walker*, ¶ 41.

¶ 59 In determining whether the prosecution's argument impermissibly shifted the burden of proof, courts primarily consider whether (1) the prosecutor specifically argued or intended to establish that the defendant carried the burden of proof; (2) the prosecutor's actions constituted a fair response to the questioning and comments of defense counsel; and (3) the jury was informed by counsel and the court about the defendant's presumption of innocence and the prosecution's burden of proof. *Santana*, 255 P.3d at 1131-32.

¶ 60     Here, considering the *Santana* factors, we disagree that the burden was shifted. First, the prosecutor never specifically argued that Ortega carried the burden of proof. *See id.* at 1133 (finding no burden shifting where "the prosecutor never explicitly argued that the defendant [had] the burden of proof"). Conversely, the prosecutor said that the prosecution carried the burden of proof at the beginning of the challenged comments.

¶ 61     Second, the prosecutor's comments were a fair response to defense counsel's arguments. In the defense's closing, counsel emphasized that Baker waited fourteen months to implicate Ortega and emphasized the differences between Baker's proffer and his trial testimony. The prosecutor's comment was a fair response to this argument.

¶ 62     Third, the jury was correctly instructed on the burden of proof by the trial court and reminded of it several times throughout the trial. Absent evidence to the contrary, we must assume that the jury understood and followed the court's instructions. *See People v. Villa*, 240 P.3d 343, 352 (Colo. App. 2009).

¶ 63     Accordingly, we discern no misconduct.

### 3.  Accusations of Lying

¶ 64    Ortega next contends the prosecutor, through the following statements, suggested that he lied to the jury[4]:

- "Why can't [Ortega] find someone to say that he was with – or that person was with him that night?  You could believe Mr. Ortega, which I just can't remember, and there's no way for me to . . . backtrack that.  And, again, this is only for credibility, because we have the burden.  Or that information doesn't exist for another reason.  *Because he'd have to get someone to come up here and perjure themselves in order to have that witness available because we'd have to create evidence that made that.*"

- "*Mr. Ortega had no choice but to get on that stand and to admit to everything he could not deny and to deny to everything he could not admit.*"

(Emphasis added.)

---

[4] At trial, Ortega objected to both statements as improper burden shifting.  However, on appeal, he argues that this statement inferred that he was lying.  To preserve an argument, a defendant must object on that ground.  *Short*, ¶ 53.  Therefore, we consider these contentions as unpreserved.

¶ 65    Accusations that the opposing parties or counsel are lying are inappropriate.  *See Domingo-Gomez*, 125 P.3d at 1050 ("The word 'lie' is such a strong expression that it necessarily reflects the personal opinion of the speaker.").  The prosecutor's comments were not improper because the prosecutor never stated that Ortega was "lying," nor did the prosecutor use any form of the word "lie."  *See id.* at 1050-51 (holding that a prosecutor's use of the word "lie" or its various forms is categorically improper).

¶ 66    Additionally, while it is improper for counsel to express his opinion about the veracity of the testimony during closing arguments, *Wilson*, 743 P.2d at 418, we do not perceive the prosecutor's statements as improper expressions of personal opinion when viewed in their full context.  *See Domingo-Gomez*, 125 P.3d at 1051 (stating that to determine whether a statement was improper opinion, a reviewing court must consider the language used, the context of the statement, and other relevant factors).  A prosecutor may point to circumstances that cast doubt on a witness's story or draw reasonable inferences about a witness's credibility from the evidence.  *Wilson*, 743 P.2d at 418.  Here, the prosecutor referenced Ortega's testimony that he did not remember

where he was the night of the shooting to cast doubt on his credibility.

### 4. Misstating the Law

¶ 67     Finally, Ortega contends that the prosecutor misstated the law and thereby lowered the prosecution's burden of proof. In closing argument, defense counsel argued:

> When you put it all together, ladies and gentlemen, when you've looked at it from this definition of reasonable doubt, a doubt which is not vague, speculative, or imaginary doubt, but would cause reasonable people to hesitate to act in matters of importance to themselves. You're sitting in the driveway going to the mountains, wondering if the oven is on. In this case, the house is on fire there's so much reasonable doubt. It's not a hesitation. We don't have to prove to you anything, ladies and gentlemen, but they have utterly failed to prove beyond a reasonable doubt.

¶ 68     In rebuttal, the prosecutor argued:

> We have to prove this case beyond a reasonable doubt. But when you start hearing metaphors, that's where it get's [sic] dicey. And it's been suggested that you should replace your eyes and your ability to read what are the jury instructions, which explain to you what is reasonable doubt, and that is not

speculative, with have you ever thought you maybe left an iron[5] on?

*Would any organization be able to prove the guilt of criminals if all a juror had to say was, I have – I think he just – there's a possibility he might not have done it, right? Because that's what you think when there might have been an iron on. I might not have turned the iron off.*

And that's vague. Why is it vague? Because you can't articulate to yourself why he might not have done it or why he might have left the iron on. *Can you articulate why Kevin Ortega isn't the one who did this?*

(Emphasis added.)

¶ 69    The prosecutor's remark was in direct response to defense counsel's analogy. The prosecutor did not misstate the reasonable doubt standard but commented on the flaws in defense counsel's analogy. Accordingly, we perceive no misconduct.

## IV.    Jury Instruction

¶ 70    Ortega next contends that the trial court erred when it changed Jury Instruction 26 for attempted aggravated robbery to correctly identify Manzanares as the victim, instead of Perez, after

---

5 Defense counsel's analogy involved an oven, but it is clear that the prosecutor was referring to this analogy.

the jury had already commenced its deliberations.  We discern no

error.

## A.    Additional Facts

¶ 71    During trial, the prosecution argued that Ortega never robbed

Manzanares but instead stole Perez's cell phone.

¶ 72    The court instructed the jury on complicity to commit

attempted aggravated robbery in Jury Instruction 26, which read:

> Complicity is not a separate crime.  Rather, it
> is a legal theory by which the defendant may
> be found guilty of a crime that was committed
> by another person.
>
> For the defendant to be guilty as a complicitor
> of the crime of attempted aggravated robbery,
> as defined at the end of this Instruction, the
> prosecution must prove each of the following
> conditions beyond a reasonable doubt:
>
> 1. Another person committed the crime of
> Criminal Attempt to Commit Aggravated
> Robbery as defined at the end of this
> Instruction . . . .
>
> . . . .
>
> For purposes of this instruction, another
> person committed the crime of Criminal
> Attempt to Commit Aggravated Robbery if the
> prosecution proves each of the following
> elements beyond a reasonable doubt:
>
> 1. That the other person,

2. in the State of Colorado, at or about the date and place at issue,

3. knowingly,

4. engaged in conduct constituting a substantial step toward the commission of aggravated robbery.

The elements of the crime of aggravated robbery are:

1. That the defendant,

2. in the State of Colorado, at our about the date and place charged,

3. knowingly,

4. took anything of value,

5. from the person or presence of another, to wit, *Antonia Perez*,

6. by the use of force, threats, or intimidation, and

7. during the act of robbery or immediate flight therefrom,

8. knowingly,

9. by the use of force, threats, or intimidation,

10. with a deadly weapon,

11. put any person in reasonable fear of death or bodily injury.

(Emphasis added.)

32

¶ 73    During the jury instruction conference, Ortega did not object

to the tendered instruction.  The court read the instruction to the

jury before closing arguments.

¶ 74    During closing arguments, the prosecution argued that Ortega

was guilty of aggravated robbery because he took Perez's cell phone

by force.  It further argued:

> Now, the attempt to commit the aggravated
> robbery is for Mr. Manzanares, and it's only an
> attempt because he didn't have anything with
> him.  Certainly the intent was there, the effort
> was there, but Mr. Manzanares had 30 bucks
> in his pocket, and he's still got it in his shorts
> that the paramedics cut off.  Otherwise, the
> elements are the same.
>
> Now, I want to talk a little bit about the
> aggravated – the robbery charges, aggravated
> robbery charges, and the complicity theory.
> Mr. Ortega is responsible for those robberies
> because they were his idea.  He had the plan,
> he told Mr. Baker that's what's going to
> happen, and once you show up at a place to
> rob somebody, you don't get to evade liability
> just because you're not the person who
> reached into the pocket or you're not the
> person who took the phone from the hand.
> Once you're in that robbery, you're in it.
>
> If you have the desire to help somebody else
> with an aggravated robbery, and the
> aggravated robbery either happens or the
> attempt happens, you're responsible for that.

You can find Mr. Ortega guilty under both theories if you want to.

¶ 75    During deliberations, the jury asked the following questions:

> 1. Does Count 3[6] apply to [Perez's] phone?
>
> 2. Does Count 5[7] apply to both [Manzanares] and [Perez]?
>
> 3. Does Count 5 apply only to [Manzanares]?

¶ 76    In discussing the questions, the trial court stated:

> The problem with this is that the instructions provided by the People as to these elementals are internally inconsistent.
>
> Instructions 22 and 23, which deal with attempted aggravated robbery, which is the Count 5, specifically list [Manzanares] as the victim. The People then wanted Instructions 24, 25, and 26 provided as to complicity on the attempt[ed] [aggravated] robbery, yet in Instruction 26 when reciting the elements of the crime of aggravated robbery, it refers to Antonia Perez.
>
> So as to Count 5, the attempted aggravated robbery, the applicable jury instructions are 22, 23, 24, 25, 26, and 27. Instruction 26 should say [Manzanares], but it says [Perez].
>
> As much as the Court would like to correct that, because this is just a scrivener's error, the Court itself questioned why [Perez's] name

---

[6] Count 3 charged aggravated robbery naming Perez as the victim.
[7] Count 5 charged criminal attempt to commit aggravated robbery naming Manzanares as the victim.

34

was there, but I did not bring it to the People's attention. I thought they had a different theory, different philosophy. I thought they were going a different direction.

And we had the weekend to review these instructions again before they were read. We finalized them on Friday, and then they were read to the jury today. No corrections were made, so I figured they were the way the People wanted them, but the fact of the matter is they're inconsistent and they're causing the jury confusion.

As much as the Court would like to correct it, given that the defense has relied on these, prepared their closing arguments, and actually made their closing arguments . . . I don't know that I can.

Off the record People suggested that in answering these two questions the Court– should refer the Jury to Instructions 22 and 23. [Defense counsel] objected to that, and the Court agrees with [defense counsel], because 22, 23, although they do not apply to the attempted [aggravated robbery], so do 24, 25, 26, and 27, and by pointing the jury – or sending a response back to the jury telling them to look at 22 and 23, with an added emphasis on those two instructions over the others that also apply and that are causing the problems, so I think the Court just has to say the Court can give you no further instructions – the Court can give you no further instruction as to your questions regarding Count 5.

¶ 77    Defense counsel objected:

I would ask – my preference would be that the Court give the same answer that you're giving to Question 1 for Questions 2 and 3. I think it's substantively the same, and it looks much more uniform, doesn't draw any – doesn't shine the light anymore – make – differentiate this problem.

I just want to make a record that I – I was of the same mind the Court was that I thought they were going in a different direction when the – when I – when I saw the – what – what now is a mistake, so I guess for the record I have to move for a mistrial. I don't want any argument, and we can deal with it later, but just want to make that record at this point in – in the proceedings.

¶ 78     The trial court responded to all three jury questions: "As to all questions: you have all the evidence. You have all the law you are to apply. Your job is to apply the facts as you find them to be to the law I have provided to you."

¶ 79     Thirty-nine minutes later, the court stated:

The Court has reconsidered its answer to Questions 2 and 3, and the reason is this: The bottom line is the Court has misinstructed the jury on the law. The attempted aggravated robbery count as to [Manzanares] . . . , Instruction 26, had a typo in it. It said [Perez].

Apparently those were cut and paste from the aggravated robbery elements as to Ms. Perez. They were inserted by the People into 26 and nobody caught it – well, the jury caught it.

36

So I have instructed the jury to stop deliberating, and my intention is to provide this updated answer to the Jury Deliberation Questions 2 and 3 indicating Jury Instruction 26 is replaced with the attached revised instruction. You should use the attached Jury Instruction 26 for your deliberations, and also maintain the original Jury Instruction 26 with the original instructions.

¶ 80    Ortega objected:

Your Honor, I object. I'll incorporate the basis that I made previously. I understand the situation we're in. I move for mistrial again. This was based – the reason we – I didn't object to it, I had the same impression that the Court did, this – this was what my argument was, this is what . . . my case was based on, and it was a mistake, and so we object.

¶ 81    The trial court responded:

And I will continue to take that motion under consideration. I guess what I'm thinking of right now, we're asking them to deal with the legal impossibility, attempted aggravated robbery was the only charge as to [Manzanares], and the Court has misinstructed them.

What – if they were to come back with a conviction on this and what the Court could do about that – well, we'll deal – we'll deal with that afterwards, but I – I feel the need to correct and at least instruct them on the law correctly, and what they have is patently incorrect on the law.

So objection noted. Thank you.

37

## B. Standard of Review and Applicable Law

¶ 82    It is the duty of the trial court to instruct the jury correctly on all matters of law. *People v. Garcia*, 28 P.3d 340, 343 (Colo. 2001). "We review de novo whether the jury instructions as a whole accurately informed the jury of the governing law." *People v. Manyik*, 2016 COA 42, ¶ 65. "However, we review the trial court's decision regarding whether to give a particular jury instruction for an abuse of discretion." *Id.*; *see also People v. Burnell*, 2019 COA 142, ¶ 36 ("Whether to provide additional instructions in response to a question from the jury is left to the sound discretion of the trial court."). A trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair, or if the court misapplies the law.

¶ 83    Crim. P. 30 provides that jury instructions shall be read to the jury before closing arguments and that counsel may comment on the instructions during closing arguments. This procedure affords counsel the opportunity to structure closing arguments based on the instructions that will govern the jury's deliberations. *People v. Bastin*, 937 P.2d 761, 764 (Colo. App. 1996). However, a trial court has the duty to correct erroneous instructions. *Id.* (concluding that

the court did not reversibly err in correcting a felony murder instruction, after charging the jury, where the instruction did not accurately state the law). If the jury asks a question during its deliberations, the court should refer the jury to the original instructions "when it is apparent that the jury has overlooked some portion of the instructions or when the instructions clearly answer the jury's inquiry." *Leonardo v. People*, 728 P.2d 1252, 1255 (Colo. 1986). But if the jury's question demonstrates that the jury has considered the relevant instruction and has a fundamental misunderstanding, or when the instructions provide no clear answer to the jury's question, the court must clarify the matter for the jury in a concrete and unambiguous manner. *See id.* at 1255-56. When circumstances require that a change in the instructions be made after closing arguments, reversible error occurs only if defense counsel was unfairly misled in formulating closing arguments or prevented from arguing a meritorious defense to the jury. *Bastin*, 937 P.2d at 764.

### C. Analysis

¶ 84 Ortega does not argue that any of the jury instructions were legally incorrect. Rather, he contends that the trial court violated

Crim. P. 30 and denied him an opportunity to structure his closing arguments based on the instructions that governed the jury's deliberations. We disagree.

¶ 85      It is well established that "the trial court has a duty to instruct the jury properly on all of the elements of the offenses charged." *Bastin*, 937 P.2d at 764. Here, Jury Instruction 26 did not properly state the elements of the crime because it incorrectly identified Perez as the victim. Further, the answer to the jury's question could not be found in the instructions. Therefore, the trial court had a duty to correct it. *See Leonardo*, 728 P.2d at 1255-56.

¶ 86      Moreover, the complaint named Manzanares as the victim of the attempted aggravated robbery, and the prosecution never suggested during the trial that the charge related to Perez. Further, Ortega's defense centered on identity and him not being the shooter. He did not argue that the shooter's actions toward Manzanares did not constitute attempted aggravated robbery. Therefore, we conclude that defense counsel was not unfairly misled in formulating closing argument or unfairly prejudiced from arguing any meritorious defense and, thus, that the trial court did not abuse its discretion in correcting Jury Instruction 26.

## V. Fingerprint Evidence

¶ 87 Ortega next contends that the trial court erred in admitting evidence that the fingerprint comparison conclusions were verified by a nontestifying witness in both the trial on the charges and the habitual criminal trial. He argues that this evidence violated his confrontation rights. We conclude that this argument is waived.

### A. Additional Background Information

¶ 88 Before trial, Ortega filed a demand for any laboratory technicians to testify in person in accordance with section 16-3-309(5), C.R.S. 2025.

¶ 89 At trial, Michael Odom, a forensic scientist at the Denver Crime Laboratory was qualified as an expert in fingerprint analysis. He explained that when comparing fingerprints to determine if they are from the same person, he uses the Analysis, Comparison, Evaluation, and Verification (ACE-V) methodology. In describing the verification aspect of this process, Odom stated:

> During the verification phase another qualified competently-trained examiner will go through the same process. They'll go through their own analysis, their own comparison, their own evaluation, and they'll reach their own independent conclusion.

41

> This is essentially like a peer review process of our methodology to see if the data substantiates the conclusion and if the results are reproducible.

¶ 90 Odom later testified: "At that point the – those comparisons were given to another examiner to go through that process for them to do their own verification process."

¶ 91 The prosecution admitted the "Denver Crime Laboratory Latent Print Unit Examination Report." The report concluded that the fingerprints lifted from Perez's car had been identified to the known exemplars for Ortega. Under "Additional Examinations," the report stated, "The identifications were verified by Certified Latent Print Examiner Amy Williams." Ortega did not object.

¶ 92 During cross-examination, defense counsel questioned Odom on the comparison process and specifically asked how many points he looked at when making a comparison. Odom testified that there is no point comparison standard, and that he did not remember how many comparison points he used in his determination.

¶ 93 At the habitual criminal trial, Ryan Huber was qualified as an expert in fingerprint comparison and identification. Huber testified that he compared Ortega's fingerprints taken from his three prior

convictions to the fingerprints taken from him in this case and concluded the fingerprints were from the same person. Over defense counsel's foundation objection, the prosecution introduced Huber's report that memorialized his findings and noted that they were peer verified. During voir dire, Huber testified that he was trained in the ACE-V techniques.

¶ 94 On cross-examination the following colloquy occurred:

> DEFENSE COUNSEL: Who was the verifier?
>
> HUBER: The verifier was Melissa Brandt.
>
> . . . .
>
> DEFENSE COUNSEL: How many times has somebody checked your work and said it wasn't correct?
>
> HUBER: Not that many. Not recently.
>
> DEFENSE COUNSEL: You don't know how many though, can you?
>
> HUBER: I don't recall. Probably only a handful of times, and that's why we do the double verification.

¶ 95 During redirect examination, Huber testified that he previously performed a comparison involving Ortega in 2021 where he was the verifier of the fingerprint comparison. The following colloquy ensued:

PROSECUTION: Were there any disagreement[s] in the conclusions from this week?

HUBER: There were no differences.

PROSECUTION: Was it verified by another –

HUBER: It was verified by a lead analyst, Melis[s]a Brandt.

PROSECUTION: Was there any disagreement in that verification?

HUBER: There was no disagreement.

¶ 96    The prosecution admitted the 2021 comparison verified by Huber.

¶ 97    The trial court found Ortega's identity had been proved by the certified court records, which included matching birthdays, identification numbers, and physical appearances in prior photographs, as well as by Huber's findings.

### B.    Standard of Review and Applicable Law

¶ 98    We review de novo whether a defendant's confrontation rights were violated.  *People v. Merritt*, 2014 COA 124, ¶ 25.

¶ 99    The Confrontation Clauses in the United States and Colorado Constitutions guarantee criminal defendants the right to confront the witnesses against them.  U.S. Const. amend. VI; Colo. Const.

art. II, § 16.  The right provided under both Confrontation Clauses is identical.  *People v. Garcia*, 2021 CO 7, ¶ 7 n.2.  That right is violated by the introduction of testimonial hearsay evidence, unless the declarant is unavailable and the defendant had a previous opportunity to cross-examine the declarant.  *People v. Jaeb*, 2018 COA 179, ¶ 13; *Bullcoming v. New Mexico*, 564 U.S. 647, 657 (2011).  A hearsay assertion is testimonial if it "was made 'with a primary purpose of creating an out-of-court substitute for trial testimony.'"  *People v. McFee*, 2016 COA 97, ¶ 34 (quoting *Ohio v. Clark*, 576 U.S. 237, 245 (2015)); *see also Merritt*, ¶ 44 (in determining whether hearsay is testimonial, "courts rely heavily on the purpose for which it was given").

## C.   Analysis

¶ 100   We conclude this contention was waived.

¶ 101   Waiver is the intentional relinquishment of a known right, and defense counsel may waive the right to confrontation.  *Cropper v. People*, 251 P.3d 434, 435 (Colo. 2011).  Indeed, in some instances, "defense counsel's inaction alone is sufficient to constitute a waiver."  *Id.* (citing *Melendez-Diaz v. Massachusetts*, 557 U.S 305, 313 n.3 (2009)).  "If [we] can infer that a defense counsel

45

intentionally did not exercise the defendant's confrontation rights, this can be an effective waiver." *People v. Rogers*, 2012 COA 192, ¶ 20.

¶ 102 A waiver may be explicit, as when a defendant "expressly abandons an existing right or privilege," or it may be implied, as when a defendant "engages in conduct that manifests an intent to relinquish a right or privilege or acts inconsistently with its assertion." *Forgette v. People*, 2023 CO 4, ¶ 28. Although a mere failure to object does not in all cases constitute a waiver, *Rediger*, ¶ 44, agreeing to a proposed course of action with full knowledge of the surrounding facts and circumstances does. *Forgette*, ¶ 34 (defendant intentionally relinquished his right to object to a sleeping juror and therefore waived any such objection for appellate review where counsel was fully aware of the sleeping juror but did not ask the court to take any action to address the issue). A waived claim of error presents nothing for an appellate court to review. *People v. Kessler*, 2018 COA 60, ¶ 68.

¶ 103 Before trial, Ortega filed a motion under section 16-3-309(5) requesting the in-person testimony of all analysts. Such filing constituted an invocation of Ortega's right of confrontation. *See*

*Cropper*, 251 P.3d at 436. But contrary to that motion, at trial, he did not object to the challenged testimony and never mentioned his pretrial motion demanding in-person testimony. Instead, defense counsel used cross-examination to undermine Odom's expert opinion. Again, at the habitual trial, Ortega did not object to the challenged testimony based on the pretrial motion and instead used cross-examination to undermine Huber's credibility.

¶ 104 Because Ortega filed the pretrial motion invoking his confrontation rights, we cannot say that defense counsel's failure to object was an oversight. Whether to make an objection at trial is often a strategic decision. *See People v. Washington*, 2014 COA 41, ¶ 43; *see also People v. Bondsteel*, 2015 COA 165, ¶ 134 (listing examples of cases where divisions of this court have recognized that failing to object can be a strategic decision), *aff'd*, 2019 CO 26. In other words, Ortega's pretrial motion shows that he knew of the error he now complains of on appeal; therefore, we conclude that his use of cross-examination to attack the experts' opinions constitutes a strategic explanation for the lack of a contemporaneous objection. *See Cropper*, 251 P.3d at 438 ("[W]e assume that when an attorney fails to comply with the procedural

rules set forth in section 16-3-309(5) the attorney has made a decision to waive defendant's right of confrontation regardless of whether the attorney knew of or understood the statute or its requirements."). Accordingly, we conclude that defense counsel intentionally chose not to object and thereby waived any argument on appeal.

## VI. Habitual Adjudication and Sentence

¶ 105 Ortega last contends that insufficient evidence supports his habitual criminal adjudication because the prosecution failed to prove beyond a reasonable doubt that two of his three felony convictions arose out of separate and distinct criminal episodes. We disagree.

### A. Additional Background Information

¶ 106 At the habitual trial, the prosecution introduced certified court records of Ortega's prior guilty pleas to second degree assault in Jefferson County Case No. 14CR2032 and to second degree assault in Jefferson County Case No. 14CR2054.

¶ 107 In Case No. 14CR2032, the arrest warrant showed that on July 2, 2014, Ortega hit a man outside a 7-Eleven store while he and an accomplice robbed him. In Case No. 14CR2054, the arrest

warrant showed that, on the same night, twenty minutes later, Ortega and an accomplice shoplifted from the same 7-Eleven store and that Ortega shoved an employee to help his accomplice escape. Ortega pleaded guilty to second degree assault in both cases. The prosecution did not join the cases, but the cases were resolved at the same dispositional hearing.

¶ 108 The trial court found that the prosecution presented sufficient evidence connecting Ortega to his three prior felonies, adjudicated him a habitual criminal, and sentenced him in accordance with the habitual criminal statute.

### B. Standard of Review and Applicable Law

¶ 109 Because Ortega challenges the sufficiency of the evidence, we review the record to determine "whether the evidence, viewed as a whole, and in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crimes charged beyond a reasonable doubt." *People v. Copeland*, 976 P.2d 334, 341 (Colo. App. 1998), *aff'd*, 2 P.3d 1283 (Colo. 2000).

¶ 110 For a defendant to be adjudged a habitual criminal under section 18-1.3-801(2)(a)(I), C.R.S. 2025, the prosecution must prove

beyond a reasonable doubt that the defendant, having been convicted of a felony, "has been three times previously convicted, upon charges separately brought and tried, and arising out of separate and distinct criminal episodes."

¶ 111   Entry of guilty pleas to multiple offenses during the same proceeding satisfies the requirement of "charges separately brought and tried" where the "predicate convictions arose from charges which, had they not been adjudicated through the entry of guilty pleas, would have been tried separately." *Gimmy v. People* , 645 P.2d 262, 267 (Colo. 1982).

¶ 112   The term "criminal episode" has the same meaning for habitual offender laws as it does under the compulsory joinder statute. *People v. Jones*, 967 P.2d 166, 169 (Colo. App. 1997). Crimes that stem from the same criminal episode include "physical acts that are committed simultaneously or in close sequence, that occur in the same place or closely related places, and that form part of a schematic whole." *Id.* (quoting *Jeffrey v. Dist. Ct.*, 626 P.2d 631, 639 (Colo. 1981)).  Charges that must be prosecuted in a single case under the compulsory joinder statute, section 18-1-408(2), C.R.S. 2025, cannot qualify as separate convictions for

habitual offender purposes. *See Jones*, 967 P.2d at 169 (allowing a defendant to be prosecuted as a habitual offender for offenses that were subject to mandatory joinder would be "inconsistent with the General Assembly's intent to reserve habitual criminal sentencing for serious recidivists").

## C.   Analysis

¶ 113   We conclude that Ortega's two convictions did not arise from the same criminal episode.

¶ 114   In *Marquez v. People*, the defendant was convicted at a single trial of attempted aggravated robbery and second degree assault. 2013 CO 58, ¶ 3.  Marquez struck a man in the jaw at a bar after the man refused to give him money or drugs. *Id.* at ¶ 4.  Within the next forty minutes, and two blocks away, Marquez robbed a second man at gunpoint. *Id.*  Eight hours later, and ten blocks away, Marquez knocked on the door of a house and accosted the homeowner with a gun. *Id.*  After three more hours, and several more blocks away, Marquez entered a home and attempted to rob a man inside at gunpoint. *Id.*  The supreme court concluded that the two crimes of violence did not arise from the same criminal episode. *Id.* at ¶ 20.  The court found that the two crimes involved a different

act, were separated by twelve hours, and involved different methods of commission (one with a fist and one with a gun), different victims, and different locations. *Id.* Further, the two crimes shared no act, mental state, result, circumstance, or defense as to which proof of one would form a substantial portion of the proof of the other. *Id.*

¶ 115 We conclude that the facts in this case are like those in *Marquez.* While both crimes occurred at the same location (7-Eleven), one crime occurred outside of the building while the other inside the building as Ortega exited. Further, twenty minutes elapsed between the two crimes.

¶ 116 Additionally, in the first crime, Ortega hit the victim while attempting to rob him. In the second, Ortega pushed a different victim out of the way to aid his accomplice's escape.

¶ 117 Finally, the record contains no evidence linking the two crimes, or the two victims, nor does it show any relationship between the two crimes other than them having occurred at the same location. Under these circumstances, we conclude sufficient evidence supports the court's finding that the two crimes were

separately brought and tried and, thus, that sufficient evidence supports Ortega's habitual criminal adjudication and sentence.

## VII. Disposition

¶ 118    The judgment is affirmed.

JUDGE GOMEZ and JUDGE MEIRINK concur.